THE UNITED STATES, APPELLANTS v. GEORGE J. F. CLARKE.

438

442

The case was argued by Mr Call, for the United States; and by Mr Berrien and Mr Wilde, for the appellee.

444

Mr Chief Justice MARSHALL delivered the opinion of the Court.

In April 1829, George J. F. Clarke, the defendant in error, filed his petition in the court of the United States, for the eastern district of Florida, praying that court to decree a confirmation of his title to sixteen thousand acres of land, granted to him on the 6th day of April 1816, by Don Jose Coppinger, then acting governor of the province of East Florida.

The attorney for the district appeared, and by his answer denied all the material allegations of the petition.

Several exhibits were filed, and several depositions were taken; and in May term 1832, the court adjudged the claim of the petitioner to be valid; from which judgment the district attorney, on behalf of the United States, prayed an appeal to this court.

As the United States are not suable of common right; the party who institutes such suit must bring his case within the authority of some act of congress, or the court cannot exercise jurisdiction over it. The counsel for the United States contends, that George J. F. Clarke has not by his petition made a case in which the United States have consented to be sued; and, consequently, that the court of the district had no jurisdiction. To maintain this objection, he has stated several principles, and cited several decisions of this court in support of them. The proposition, that in courts of a special limited jurisdiction, which that of East Florida unquestionably is in this case, the pleadings must contain averments which bring the cause within the jurisdiction of the court, or the whole proceeding will be erroneous, is admitted. The inquiry is, does the petition of George J. F. Clarke contain these averments.

Florida contained an immense quantity of vacant land which the United States desired to sell. Numerous tracts, in various parts of this territory, to an amount not ascertained, had been granted by its former sovereigns, and confirmed by treaty. To avoid any conflict between these titles and those which might be acquired under the United States, it was necessary to ascer-

tain their validity, and the location of the lands. For this purpose boards of commissioners were appointed, with extensive powers, and great progress was made in the adjustment of claims. But neither the law of nations, or the faith of the United States, would justify the legislature in authorizing these boards to annul pre-existing titles, which might consequently be asserted in the ordinary courts of the country, against any grantee of the American government. The powers of the commissioners therefore were principally directed to the attainment of information, on which they might report to congress, who generally confirmed all claims on which they reported favourably. After considerable progress had been thus made in the adjustment of titles, congress, on the 26th of May 1830, passed an act for the final settlement of land claims in Florida This act, after confirming titles to a considerable extent, which are described in the first, second and third sections, enacts that all the remaining claims which have been presented according to law, and not finally acted upon, shall be adjudicated and finally settled upon the same conditions, restrictions and limitations, in every respect, as are prescribed by the act of congress, approved 23d of May 1828, entitled, " An act," &c.

It was obviously the intention of congress to extend the jurisdiction of the court to all existing claims, and to have them finally settled. The purpose for which the act was made could not be otherwise accomplished. Any claim which the court was unable to decide on the petition of the claimant, would remain the subject of litigation. This would defeat the obvious intention of congress, which ought to be kept in view in construing the act.

The words which confer jurisdiction, and describe the cases on which it may be exercised, are " all the remaining cases which have been presented according to law, and not finally acted upon." The subsequent words "shall be adjudicated," &c. prescribe the rule by which the jurisdiction previously given shall be exercised.

The petition of Clarke, after showing his title under the government of Spain, adds, " your petitioner farther states, that his aforesaid claim was filed before the board of commissioners, appointed to ascertain claims and titles to lands in East Florida, who, as he is informed and believes, refused to recom-

mend the same to the favourable notice of the United States government; and have rejected the same, but have not reported it forged or ante-dated." Do these averments satisfy the requisites of the statute?

The act requires that it shall "have been presented according to law, and not finally acted upon." The petition states, "that it was filed before the board of commissioners," which is presenting it "according to law;" and then proceeds to state the action of the board upon it. That action is not by law made final, consequently the case is one of those which the court is directed to adjudicate and finally settle, on the principles contained in the act of 1828. Any defect in the title as exhibited, will be considered in deciding on the right, but does not constitute an objection to jurisdiction.

The title, as set out in the petition and exhibits filed with it, is as follows:

On the 16th of March 1816, George J. F. Clarke, styling himself a native of the province, presented a memorial to the governor of East Florida, in which he states the service he has rendered the public, by inventing and constructing a saw mill of great execution, and prays, in consideration thereof, a grant of the quantity of land which his honour had thought proper to assign to the water mills, equivalent to five miles square; which land he solicits on the western part of St John's River, above Black Creek, at a place entirely vacant, known by the name of White Spring.

On the 3d of April the governor made a decree, in which, after reciting that he had granted lands to other individuals on account of saw-mills or machines to be erected, but with condition of being without effect until the establishments be made, and that Clarke had exhibited proof of the actual erection of a mill of great utility, grants to the said George Clarke the five miles square of land that he solicits, " of which a title shall be issued, comprehending the place, and under the boundaries set forth in this petition, without injury to a third person."

The title was issued on the sixth of the same month. It recites that " whereas by a royal order communicated to the government on the 29th of October 1790, by the captain-general of the island of Cuba and the two Floridas, it is provided, among other things, that to foreigners who, of their free will,

present themselves to swear allegiance to our sovereign, there be granted to them lands gratis, in proportion to the workers that each family may have; and whereas Don George Clarke, inhabitant of the town of Fernandina, has presented himself, manifesting that he has constructed, from his own ingenuity, a machine that, with four horses, saws eight lines at one time, cutting two thousand superficial feet of timber in a day, and soliciting in virtue thereof a grant in absolute property of five miles square of land," &c.; " therefore, and in consideration of the advantages arising from such improvements in this said province, and in order that, by rewarding the industrious and ingenious, it may serve as an example and stimulus to other inhabitants, I have found proper, by my decree of the third of the present month, to order the issue of a competent title of property of said five miles square of land, as will more fully appear," &c. " Therefore I have resolved to grant, as in the name of his majesty I do grant," &c.

An order to survey the land contained in this grant was given by the governor on the 29th of December 1818.

Afterwards, on the 25th of January 1819, Clarke presented a memorial to the governor, stating that the quantity of land required for his purpose could not be obtained at the place designated, and praying that the depth back might be contracted to about one and a half miles, and the residue be surveyed at a different place described in the memorial. This prayer was granted, and surveys were executed and returned, placing eight thousand acres on the ground described in the decree and grant, and the remaining eight thousand acres, in two surveys, on the ground designated in the memorial of the 25th of January 1819.

The counsel for the United States contend, that the grant made to the petitioner, by the governor of East Florida, is void, because he had no power to make it.

The royal order of the 29th of October 1790, which is recited in the grant of the 6th of April 1816, most certainly does not authorize that grant. It was avowedly made for the purpose of inviting foreigners into the province, and Clarke was an inhabitant. It limited the quantity of land to be granted to a fixed number of acres for the workers that each family may have; and it is not doubted that the quantity actually

contained in the grant far exceeded the quantity authorized by that order. It is too plain for argument that, if the validity of the grant depends on its being in conformity with the royal order of 1790, it cannot be supported. But we do not think it does depend on that order.

Although the order is recited, the grant does not profess to be founded on it. That it is not, is most apparent. The grant immediately proceeds to recite that Clarke is an inhabitant of Fernandina, which would of itself defeat his application if depending on the order in favour of " foreigners who of their free will present themselves to swear allegiance to the sovereign" of the grantor. It then proceeds to state the real motive for which it is made. It is that he has constructed a machine of great value. It is for this, and not for his being willing to swear allegiance to the king of Spain, that he solicits the grant. " Therefore," proceeds the grant, " and in consideration of the advantages arising from such improvements in this said province, and in order that, by rewarding the industrious and ingenious, it may serve as an example and stimulus to other inhabitants, I have found proper, by my decree of the third of the present month, to order the issue of a competent title," &c. " Therefore," that is in execution of the decree of the third, " I have resolved to grant," &c.

The grant, then, of the 6th of April is avowedly made in execution of the decree of the 3d. That decree contains no allusion to the royal order of October 1790, but professes to be founded entirely on the motives afterwards expressed in the grant itself in addition to that order.

We cannot think, that the recital of a fact entirely immaterial, on which fact the grant does not profess to be founded, can vitiate an instrument reciting other considerations on which it does profess to be founded, if the matter, as recited, be sufficient to authorise it.

Without attempting to assign motives for the recital of that order, we are of opinion, that, in this case, the recital is quite immaterial, and does not affect the instrument. The real inquiry is, whether governor Coppinger had power to make it.

By the second article of the treaty of the 22d of February 1819, between the United States of America and Spain, his catholic majesty cedes to the United States, in full property

and sovereignty, all the territories which belong to him situated on the eastward of the Mississippi, known by the name of East and West Florida.

This article undoubtedly transfers to the United States, all the political power which our government could acquire, and all the royal domain held by the crown of Spain; but has never been supposed, so far as is now understood, to operate on the property of individuals. This court has uniformly expressed the opinion that it does not.

The eighth article was not intended to enlarge the cession. Its principal object is to secure certain rights existing at the time, but not complete. It stipulates that all the grants of land (in Spanish " concessions of land") made before the 24th of January 1818, by his catholic majesty, or by his lawful authorities in the said territories, ceded by his majesty to the United States, shall be ratified and confirmed (in Spanish, shall remain ratified and confirmed) to the persons in possession of the lands (in the Spanish, in possession of them, that is, of the concessions) in the same extent that the same grants (in Spanish, they) would be valid, if the territories had remained under the dominion of his catholic majesty.

It may be worth observing, that the language of the article is not " all grants made by his catholic majesty, or by his lawful authority," which might perhaps involve an inquiry into the precise authority or instructions given by the crown to the person making the grant, and might impose on the claimant the necessity of showing that authority in each case, but " by his catholic majesty, or his lawful authorities in the said territories ceded by his majesty to the United States." That is, by those persons who exercised the granting power by authority of the crown. This is the generally received meaning of the words. They are equivalent to the words, competent authorities, used in their place by the king of Spain in his ratification of the treaty.

It may be also not entirely unworthy of remark, that this article expressly recognises the existence of those " lawful authorities" in the ceded territories.

It is not unreasonable to suppose that his catholic majesty might be unwilling to expose the acts of his public and confidential officers, and the titles of his subjects acquired under

those acts, to that strict and jealous scrutiny which a foreign government, interested against their validity, would apply to them, if his private instructions or particular authority were to be required in every case, and that he might, therefore, stipulate for that full evidence to the instrument itself which is usually allowed to instruments issued by the proper officer. The subject matter of the article, therefore, furnishes no reason for construing its words in a more restricted sense than that in which they are uniformly used and understood. In that sense, they mean persons authorised by the crown to grant lands.

The subsequent part of the sentence may, in some degree, qualify their meaning. The added words are; "to the same extent that the same grant (they) would be valid, if the territories had remained under the dominion of his catholic majesty."

If this part of the sentence was intended as a limitation of the general provision which precedes it, the subject matter of the article may serve in some measure to explain it.

The general word "grant" may comprehend both the incipient and the complete title. The greater number of those in Florida appear to have been of the first description. Many of these contained conditions, on the performance of which the right to demand a complete title depended. Without this qualification, the article might have been understood to make these conditional concessions absolute. Therefore, they are declared to "be ratified and confirmed," to the same extent that the same grants (they) would be valid if the territories had remained under the dominion of his catholic majesty." The parties add, (continuing the idea) "but the owners in possession of such lands (the proprietors) who, by reason of the recent circumstances of the Spanish nation, and the revolutions in Europe, have been prevented from fulfilling all the conditions of their grants (concessions) shall complete them within the terms limited in the same respectively from the date of this treaty; in default of which, the said grants (they) shall be null and void."

But whether the intention of that part of the article which declares the extent to which the titles it contemplates shall be valid, is limited to the conditions inserted in them, or qualifies the general preceding words, it cannot vary the sense of

the term "lawful authorities," nor warrant the construction that a title derived from "a lawful authority" creates no presumption of right, and leaves the holder under the necessity of proving every circumstance which would be required to support it, had it proceeded from a person not holding an office on which the power of granting lands had been conferred.

These titles are to be valid to the same extent as if the territories had not been ceded. What is that extent? A grant made by a governor, if authorized to grant lands in his province, is prima facie evidence that his power is not exceeded. The connection between the crown and the governor, justifies the presumption that he acts according to his orders. Should he disobey them, his hopes are blasted, and he exposes himself to punishment. His orders are known to himself and to those from whom they proceed, but may not be known to the world.

Such a grant, under a general power, would be considered as valid, even if the power to disavow it existed, until actually disavowed. It can scarcely be doubted, so far as we may reason on general principles, that in a Spanish tribunal, a grant having all the forms and sanctions required by law, not actually annulled by superior authority, would be received as evidence of title.

We proceed then to inquire into the power of the governor of East Florida.

It will not be material to ascertain the rules by which lands were granted to the first settlers of America, or the officers from whom titles emanated. So early as the year 1735, an ordinance was passed by which the king reserved to himself the right of completing the titles given by his provincial officers.

The inconvenience resulting from this regulation was so seriously felt, that the ordinance was repealed in 1754, and the whole power of confirming, as well as originating titles, was transferred to officers in the colonies. The power of appointing sub-delegate judges, to sell and compromise for the lands and uncultivated parts of the dominions of the Spanish crown in the Indies, was declared to belong to the viceroys and presidents of the royal audiences of those kingdoms; and

the same royal order directed that "in the distant provinces of the audiencias, or where sea intervenes, as Caraccas, Havana, Carthagena Buenos Ayres, Panama, Yucatan, Cumana, Margarita, Puerto Rico, and in others of like situation, confirmations shall be issued by their governors, with the advice of the *officiales reales* (the king's fiscal ministers) and of the lieutenant general, *hateado*, where he may be stationed.

In 1768, this power of granting and confirming titles to lands was vested in the intendants.

In 1774, it was revested in the civil and military governors (see White's Compilation 218). In October 1798, this power was again conferred on the intendant, so far as respected Louisiana and West Florida; but this order did not extend to East Florida. In that province it remained in the governor.

The regulations of the governors O'Reilly and Gayoza, and the proceedings of the governors Quisada, Estrada, White, Kindelan and Coppinger, of East Florida, and all the grants which have been brought to the view of this court, together with the reports of the commissioners appointed to adjust land titles in the territories ceded by Spain, show, that from the year 1774, the power of granting lands was vested in the governors, both of Louisiana and the Floridas. The ordinance of 1798, wh'ch transferred it to the intendant of Louisiana and West Florida, did not extend to East Florida: consequently it remained with the governor of that province.

This is admitted by the counsel for the United States.

So far then as respects East Florida, the term "lawful authorities" designates the governor as certainly as if he had been expressly named in the eighth article of the treaty. He is the officer who was empowered by his sovereign to make grants of lands in that province, and in ceding the province to the United States, his sovereign has stipulated that grants made by him shall be as valid as if the province had remained under his dominion.

It has been already stated that the acts of an officer, to whom a public duty is assigned by his king, within the sphere of that duty, are, prima facie, taken to be within his power. This point was fully considered and clearly stated by this court in the case of Arredondo, and the principles on which the opinion rests are believed to be too deeply founded in law

and reason ever to be successfully assailed. He who would controvert a grant executed by the lawful authority, with all the solemnities required by law, takes upon himself the burden of showing that the officer has transcended the powers conferred upon him, or that the transaction is tainted with fraud.

This the counsel for the United States undertakes to do. He insists that governor Coppinger has transcended his powers in making the title now under consideration for a larger quantity of land than he was empowered to grant, and on a consideration not warranted by law.

The object of Spain, as of all the European powers who made settlements in America, was to derive strength and revenue from her colonies. To accomplish this, grants of lands to individuals became indispensable. History informs us that this measure was adopted by all. The immense territories held by Spain, affording an almost inexhaustible fund of lands claimed by the crown, could scarcely fail to produce large grants to favourites, as well as a regular system for inviting population into her colonies. The viceroys in New Spain and Peru, who were also governors, possessed almost unlimited powers on this and other subjects ; but in distant provinces, or where sea intervenes, the right of giving title to lands was vested in their governors with the advice of the king's fiscal ministers and of the lieutenant general, where he may be stationed. No public restraint appears to have been imposed on the exercise of this power. The officer and his conduct were of course under the supervision and control of the king and his ministers, and especially of his council of the Indies.

In 1735, this power was withdrawn from the provincial officers, but was restored to them in 1754. Wh. Comp. 49. Clarke's Land Laws 973. The royal order of 15th October 1754 confers this power in general terms without any limitation on the quantity or on the consideration which may move to the grant. It would excite surprise if, in a monarchy like that of Spain, no rewards in land could be granted for extra services, and no favours could be bestowed. Among the earliest laws for the government of America (Wh. Comp. 30) is an order that the viceroys of Peru and Mexico " grant such rewards, favours and compensation as to them may seem fit." A sub-

sequent order (Wh. Comp. 41), after directing extensive dispositions of territory, adds, "all the remaining land may be reserved to us, clear of any incumbrance, for the purpose of being given as rewards, or disposed of according to our pleasure." In White's Comp. 29, we find the following law : "it is our pleasure that services be remunerated where they shall have been performed, and in no other place or province of the Indies."

It would seem that these remunerations, if in land, would be made by the governor, when empowered to grant them, provided no other officer was designated.

Two letters of the 3d of April 1800, from an officer authorized to grant lands, are published in Clarke's Land Laws 989, which would seem to countenance the opinion that they did not consider their powers as limited to small quantities, but that they might exercise discretion in this respect.  They are written by the attorney-general under Morales.  The first, addressed to Don Henry Peyroux, is in these words : "I have to reply to your communication No. 9, that I cannot at this time consent to the sale of lands in the manner and under the circumstances requested ; and I have to make the same reply to that of the 6th of February last, No. 8, in which you ask for one hundred thousand arpens."

The language of this letter is rather that of a man who has exercised his discretion on a subject to which his power extends, than of one who might at once repel the application by referring to the orders of his sovereign.  The second letter is of the same character.

A royal order was issued on the 4th of January 1813, which recites that the general Cortes have decreed as follows : "considering that the conversion of public lands into private property is one of the measures which the welfare of the people, as well as the advancement of agriculture and industry, most imperiously demands ; and desiring, at the same time, that this class of lands should serve as an aid to the public necessities, a reward to the deserving defenders of the country, and a support to the citizens who are not proprietors, the general and extraordinary Cortes do decree :

" All the uncultivated or public lands, and those of the corporation of cities, with the timber thereon or without it, both

in the peninsular and adjacent islands, as well as in the ultra marine provinces, except the commons necessary for the towns, shall be made private property."

" In whatever manner these lands be distributed, it shall be in full property."

This order was transmitted to the captain general of the Island of Cuba; but seems to have been repealed on the 22d of August 1814.

We do not find any limitation in the royal orders restricting the power of the governors to a league square in their grant.

The counsel for the United States searches for them in the regulations by colonial officers, prescribing the rules to be observed in the offices established for the purpose of carrying these orders into execution, and in special orders of the crown for specified objects.

The first to which reference has been made, were issued by Don Alexander O'Reilly, governor of Louisiana. He recites, among other things, the complaints and petitions which had been presented to him by the inhabitants, together with the knowledge he had acquired of their local concerns, by a visit lately made to the Cote des Allemands, &c. and from an examination made of the report of the inhabitants assembled by his order in each district, states his conviction that the tranquillity of the inhabitants and the progress of culture required, which shall fix the extent of the grants of lands which shall hereafter be made, &c., and adds, " for these causes, and having nothing in view but the public good and the happiness of every inhabitant, after having advised with persons well informed in these matters, we have regulated all these objects in the following articles :

" 1st. There shall be granted to each newly arrived family," &c.

This is most obviously the language of a man who supposes himself to possess full power over the subject. The rules he prescribes for himself, do not purport to be limits imposed by a master, but to be marked out by his own discretion, and to be alterable at will. He makes no allusion to orders emanating from his sovereign, marking out the narrow path he is bound to tread; but gives the law himself, in the character of a man invested with full powers.

The eighth article declares that, "no grant in the Opelousas, Atacapas, and Natchitoches, shall exceed one league in front by one league in depth; but when the land granted shall not have that depth, a league and a half in front by half a league in depth, may be granted."

Had the limitation on the quantity to be granted been five miles square instead of a league square, is there any thing in the information we possess, which would enable us to say that the one more than the other would be an excess of power.

The instructions of governor Gayoso are dated in September 1797, till which time it may be presumed that those of O'Reilly remained in force. His instructions are for the government of the commandants of ports, who appear to have been entrusted with the power of making concessions. His regulations, so far as they varied those which pre-existed, constituted, it may be presumed, a new law for the commandants, but do not prove the existence of restrictions on his own power. Like those of O'Reilly, they give every indication of proceeding from an officer possessing general and very extensive powers.

The same observation applies to the regulations of Morales, who was intendant of Louisiana and West Florida. They are dated in July 1799, soon after receiving the order of the king of October 1798, which directed "that the intendancy of these provinces be put in possession of the privilege to divide and grant all kind of land belonging to his crown; which right, after his order of the 24th of August 1770, belonged to the civil and military government: Wishing to perform this important charge, &c.

"After having examined, with the greatest attention, the regulation made by his excellency, count O'Reilly, the 18th of February 1770, as well as that circulated by his excellency the present governor, Don Manuel Gayoso de Lernos, the 1st of January 1798, and with the counsel which has been given me on this subject by Don Manuel Senaro, assessor of the intendency, and other persons of skill in these matters, that all persons who wish to obtain lands, may know in what manner they ought to ask for them, and on what condition land can be granted and sold, &c., I have resolved that the following regulations shall be observed."

He then proceeds to regulate, with great exactness, the course to be observed by those who seek to obtain concessions, the conditions on which they shall be granted, and the conduct to be observed before a complete title will be made. These regulations do not measure his power, but give the law to those who are to execute his orders.

These are the proceedings of the officers who were entrusted with the power to divide and grant the crown lands in Lousiana and West Florida. It is not to be presumed that different powers were conferred on the officers to whom the same duties were confided in East Florida.

Internal regulations of police were issued by governor Quesada on the 2d of September 1790. They commence with saying, " Whereas I am commanded by royal orders, agreeable to the public wants, to apply the most reasonable and quick remedies thereto : for the purpose, therefore, of accomplishing this, in the edict commonly called ' internal regulations of police,' I have taken the most conducive steps, notwithstanding, much to my sorrow, there has been so much to amend and establish, that a voluminous code would scarcely be sufficient for me to comprise all, in proportion to the ardent desire which animates me for the prosperity of the province and the service of the sovereign ; wherefore, merely for the present, and reserving hereafter, when permitted by my other duties, the right of attending particularly to this important subject, I therefore make known and order the following :

" 1st. I grant to all the inhabitants permanently settled, and subjects of his majesty, in his royal name, for their use, the quantity of land they may require, in proportion to their force, in any part of the desert province, without any exception. To this end, those desirous of obtaining the same, will present themselves to me, within twenty days, stating their circumstances, by memorial ; what lands they have obtained to the present period, and to what quantity, and in what place they are desirous of locating them now : under the precise condition that it will be without injury to a third person, I will attend to their solicitude according to the examination I may make thereof; and although the laws of the Indies authorise me to make no absolute distribution of the same, and being in the case of tit. 12th, book 4th, I abstain, therefrom, from powerful motives.

But for the greater security of those interested, I will forward my ideas and representation on the subject to the king, persuaded that, in consequence thereof, those obtaining grants from me now will be confirmed in the possession of the same."

The law of the Indies to which the governor refers, is inserted in Clarke's Land Laws, p. 967, and is in these words : " That our subjects may apply themselves to the exploration and settlement of the Indies, and that they may live with comfort and convenience, which we desire, it is therefore our will, that houses, grounds, lands, cavallerias and peonias, be granted to all those who shall settle new lands, in the villages and places that the governor of the new settlement shall mark out for them. There shall be a distinction made between gentlemen and labourers (peones), and those who shall be of less grade and merit ; and in proportion to their services, the lands shall be increased and ameliorated for prosecuting agriculture, and the tending of cattle."

It is not easy to comprehend precisely the influence which this law ought to have on the governors of the Spanish colonies. It was undoubtedly the same in them all.

We collect from the extracts from the laws of the Indies which are given us in Clarke's Land Laws, and White's Compilation, that they apply chiefly to the general purposes of population and settlement. For the attainment of these objects, general rules were framed, which contained affirmative instructions to the officers, to be observed in the formation of new settlements, in donations to emigrants, and in the sale and distribution of crown lands. How far a discretion in the execution of these laws, or whether any discretion, was placed in those distant officers to whom they were directed, we have not the means of ascertaining. So far as we are informed, they contain no negative or prohibitory words, and the regular reports of governors must have kept their superiors informed of their proceedings. Mr White says, p. 9, " I sought assiduously, but have been unable to discover a record or notice of the proceedings upon some grant or concession which had been made by a captain general, intendant or governor, and disapproved of by the king. I have been unable to ascertain whether any such exist."

The regulations of governor Quesada, which have been cited, and in which he appears to have deviated, in some

respects, from the law to which he refers, apply to the general objects of cultivation, population and settlement, and ought to conform to the laws which had been framed for those subjects. He seems to grant a general privilege to every individual to acquire lands at will. He retains to himself no discretion, exercises no judgment in the case. "I grant," he says, "to all the inhabitants permanently settled, and subjects of his majesty, in his royal name, for their use, the quantity of land they may require in proportion to their force, in any part of the desert province, without exception." Yet he is persuaded that these grants will be confirmed.

These extraordinary regulations were in the exercise of that ordinary power to which general laws had been adapted. The right to bestow rewards on those individuals who had rendered any particular service, constituted a distinct branch of power, to which those general laws could not apply. White's Compilation abounds with extracts showing the disposition of the king, that they should be given liberally.

Governor White succeeded governor Quesada. In conformity with usage, he proclaimed, in October 1803, the rules by which it was his purpose to be governed in the concessions and divisions of lands to the new settlers. He adopts a more rigid practice than had been observed by his predecessors; but these rules appear to emanate from his own judgment, and to be intended to apply only to new settlers, who come to establish themselves in the province.

Don Nicholas Ganido, the agent of the duke of Allegon, to whom all or nearly all the uncultivated land of East Florida, had been granted by the king, addressed a letter to the governor, in February 1819, soliciting official information respecting the validity of titles which had emanated from him or his predecessors. It is not supposed that this letter, or the answer to it, can be received as authority; but when it is considered, that the duke of Allegon believed himself to be the lawful proprietor of all the lands not regularly vested in others, and was of course anxious to defeat the titles of others; and that the questions were asked by, and addressed to those who were best acquainted with the authority of the governor, and the principles on which he acted, we may, on a subject on which so little light can be shed, look at the letter, and the answer to it.

Seventh. "In what manner are those concessions considered, which were made to foreigners or natives, of large portions of land, who have disappeared, carrying with them their documents, without having cultivated or even seen the lands granted to them ?"

Eighth. "Can those persons, to whom assignments of large portions of territory have been made for the establishment of factories, such as water or steam mills, who did not then comply, nor have not since presented themselves to establish their machinery (allowing that none exists in the province which is known), be considered now, or in future, with any right ? If, in a space of time, such as has elapsed until now, they have not established their works, will there be any reason why said lands should not be declared open, and revert to the class of public lands ?"

These questions are asked by the agent of the duke of Allegon, a favourite of the king. They relate exclusively to those large grants which are now said to have exceeded the power of the governor. They were of course known to the duke of Allegon, and, we must presume, to his master. Yet an excess of authority is not even suggested. No doubt seems to be entertained of the validity of those which had been completed by the grant of a full title, or of those still incomplete, the conditions of which have been performed. The inquiry respects those persons only, who had totally neglected the conditions contained in their grants. Their titles alone seem to be doubted even by the duke of Allegon.

This letter appears to have been referred by the governor to Ruperto Saavedra, who answers all the inquiries made by Ganido. He says, "those who have titles of proprietorship, who have complied with the conditions pointed out to entitle them to them, or have obtained them as a remuneration for services, or other considerations deemed by the government sufficient for the purpose ; in these cases there is a precise obligation to respect said titles, especially as the said conditions have been established at the will of the governors, and that the royal order of 1790, on the subject, impairs none, but expressly states, that lands shall be granted and surveyed gratis, to those foreigners who, of their own free will, present themselves to swear allegiance."

After observing that the donation to the duke of Allegon, is limited " to uncultivated lands which have not been granted," Saavedra says ; " yet it is proper to explain, in this particular, that the concessions made to foreigners or natives, of large or small portions of land, carrying their documents with them (which shall be certificates issued by the secretary), without having cultivated or even seen the lands granted to them, such concessions are of no value or effect, and should be considered as not made, because the abandonment has been voluntary, and that they have failed in complying with the conditions prescribed for the encouragement of population. The assignments of extensive portions of territory, which have been made for the establishment of factories, to persons who did not then comply, nor have not since presented themselves to establish their mechanical works, ought also to be considered without any right or value, and said lands declared perfectly free, that they may revert into the class of public lands," &c.'

This opinion was laid before governor Coppinger, and approved by him. It recognises the right to grant as " a remuneration for services, or other considerations deemed by the government sufficient for the purpose ;" and speaks of concessions to foreigners or natives, for large or small portions of land as equally valid. The right they give to a complete title, depends on the conduct of the proprietor, on his compliance or non compliance with the conditions, not on the quantity conceded. The same principle applies " to assignments of extensive portions of territory, which had been made for the establishment of factories" which have not been erected. The extensiveness of the territory assigned, is not made an objection ; but the failure to perform the condition on which the concession was made.

It is apparent, that both the agent of the duke, and Saavedra, considered these large concessions as within the power of the governor.

The counsel for the United States relies confidently on the letter of governor Kindelan, of the 4th of June 1803, addressed to the captain general of Cuba, in which he recommends the militia who had served during the late insurrection, and third battalion of Cuba, as worthy the gifts to which the supreme governor may think them entitled. He suggests granting " to

·the soldiers a certain quantity of land, as established by regulations in this province, agreeably to the number of persons in each family."

On the part of the United States it is insisted, that this application could not have been made, had the governor been authorized by the existing laws to reward their services still more liberally.

The argument has undoubtedly great weight, but we do not think it conclusive.

Grants to a whole class of individuals, a distribution of lands among the body of the colonial militia, and a battalion of a different province, might be expected to belong rather to the general system of distribution than to that branch of it which authorizes rewards to individuals for particular special services, and might be expected to proceed directly from the crown, or to have its express sanction.

If not all the extracts from the laws of the Indies, at least by far the greater part of them, which we find in White's Compilation, relating to rewards, contemplate services peculiar to the individual, not those which are of a general character. We do not think, therefore, that an application to superior authority for a distribution of lands among the militia who have served during a period of dangerous insurrection, is necessarily to be be ascribed to the consciousness of wanting power to give a reward in lands to an individual whose invention is deemed meritorious.

The favour of granting rewards is expressed in terms indicating the expectation that it is to be exercised by those governors who are also viceroys; but there are no prohibitory words, and the general power of granting lands, extended to the governors of distant provinces, or where sea intervenes, may comprehend granting as a reward for individual merit. The facts that this power was exercised certainly as early as 1813, by the governor or East Florida, that the condition of the province and the exhausted state of the kingdom seemed to require and justify it, and that the king never disapproved the proceedings of the governor, existed when the treaty was formed. Such was the state of things to which the treaty applied.

It is stated that the practice of making large concessions

commenced with the intention of ceding the Floridas, and these grants have been treated as frauds on the United States.

The increased motives for making them have been stated in argument, and their influence cannot be denied. But admitting the charge to be well founded, admitting that the Spanish government was more liberal in its concessions after contemplating the cession than before, ought this circumstance to affect bona fide titles to which the United States made no objection.

While Florida remained a province of Spain, the right of his catholic majesty, acting in person or by his officers, to distribute lands according to his pleasure, was unquestioned. That he was in the constant exercise of this power, was well known. If the United States were nor content to receive the territory, charged with titles thus created, they ought to have made, and they would have made, such exceptions as they deemed necessary. They have made these exceptions. They have stipulated that all grants made since the 24th of January 1818, shall be null and void.

It is understood that this stipulation was intended to embrace three large grants made by the king, which comprehended nearly all the crown lands in East Florida. However this may be, it shows that the subject was in the mind of the negotiators, and that the apprehended mischief was guarded against so far as the parties could agree. The American government was content with the security which this stipulation afforded, and cannot now demand farther and additional grounds. The acquisition of the Floridas was an object of immense importance to the United States. It was urged by other considerations of a still more powerful operation, in addition to vacant lands. It will be regarded, while our union lasts, as the highest praise of the administration which made it, and of the negotiator who accomplished it. It cannot be doubted that the terms were highly advantageous, and that they were so considered by all. The United States were satisfied, and had reason to be satisfied, with the provision excluding grants made subsequent to the 24th of January 1818, when the fraud on that provision was prevented by the terms of the ratification of the treaty. All other concessions made by his catholic majesty, or his lawful authorities in the ceded territo-

ries. (in the ratification by the king of Spain, " competent authorities"), are as valid as if the cession had not been made. If it be shown by the person holding the concession, that it was made by the officer authorised to grant lands, that it was the duty of this officer to give a regular account of his official transactions, that no grant ever made by the person thus entrusted, had ever been disapproved ; courts ought to require very full proof that he had transcended his powers, before they so determine. We do not think this full proof has been given in the present case.

The considerations then recited in the grant, in addition to the royal order of October 1790, are, we think, sufficient to maintain it.

It will be proper to take a concise review of the legislation of congress on this subject.

The first act, passed on the 8th of May 1822, entitled " an act for ascertaining claims and titles to land within the territory of Florida," (L. U. S. vol. 7, p. 103) directs that commissioners be appointed " for the purpose of ascertaining the claims and titles to lands within the territory of Florida, as acquired by the treaty of the 22d of February 1819." The sixth section enacts, " that every person, or the heirs or representatives of such persons, claiming titles to lands under any patent, grant, concession or order of survey, dated previous to the 24th day of January 1818, which were valid under the Spanish government or by the law of nations, and which are not rejected by the treaty ceding the territory of East and West Florida to the United States, shall file before the commissioners his, her or their claim, setting forth particularly its situation and boundaries, if to be ascertained, with the deraignment of title when they are not the grantees or original claimants," &c. " And said commissioners shall proceed to examine and determine on the validity of said patents, grants, concessions and orders of survey, agreeably to the laws and ordinances heretofore existing, of the governments making the grants respectively, having due regard, in all Spanish claims, to the conditions and stipulations contained in the eighth article of a treaty concluded at Washington, between his catholic majesty and the United States, on the 22d of February 1819; but any claim not filed previous to the 31st day of May 1823, shall be deemed and

held to be void and of none effect."- They were directed to examine all these claims; and, if satisfied that they were correct and valid, to confirm them; "provided that they shall not have power to confirm any claim, or part thereof, where the amount claimed is undefined in quantity, or shall exceed one thousand acres; but in all such cases shall report the testimony, with their opinions, to the secretary of the treasury, to be laid before congress for their determination."

The object of this law cannot be doubted. It was to separate private property from the public domain, for the double purpose of doing justice to individuals, and enabling congress safely to sell the vacant lands in their newly acquired territories. To accomplish this object, it was necessary that all claims, of every description, should be brought before the commissioners, and that their powers of inquiry should extend to all. Not only has this been done, but, further to stimulate the claimants, the act declares "that any claim not filed previous to the 31st of May 1823, shall be deemed and held to be void and of none effect." This primary intention of congress is best promoted by determining causes finally, where their substantial merits can be discerned.

The subsequent acts of congress, respecting the board of commissioners, have no material-influence on the question before the court.

On the 23d of May 1828, congress passed "an act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida."

This act confirms all claims contained in the reports of the commissioners of East Florida, and in the reports of the receiver and register acting as such, "to the extent of the quantity contained in one league square," and continues the powers of the register and receiver, till the first Monday in the following December.

The sixth section enacts, "that all claims to land within the territory of Florida, embraced by the treaty between Spain and the United States, of the 22d of February 1819, which shall not be decided and finally settled under the foregoing provisions of this act, containing a greater quantity of land than the commissioners were authorised to decide, and above the amount confirmed by this act, and which have not been re-

ported as antedated or forged, by said commissioners, or regis-
ter and receiver acting as such, shall be received and adjudi-
cated by the judge of the superior court of the district in which
the land lies, upon the petition of the claimant," &c.

The report of the register and receiver being made, con-
gress, on the 26th of May 1830, passed "an act for the final
settlement of land claims in Florida."

This act, after confirming the claims it recites, declares that
all the remaining claims which have been presented according
to law, and not finally acted upon, shall be adjudicated and
finally settled upon the same conditions, restrictions and limi-
tations in every respect, as are prescribed by the act of con-
gress, approved the 23d of May 1828, entitled "an act supple-
mentary to the several acts for the settlement and confirma-
tion of private land claims in Florida."

That act refers to the act approved May the 26th 1824, en-
titled "an act enabling the claimants to land within the limits
of the state of Missouri, and territory of Arkansas, to institute
proceedings to try the validity of their claims."

This last recited act provides for the trial of claims "protected
or secured" by the treaty which ceded Louisiana to the United
States.   After describing those claims in terms supposed to
comprehend them all, the act proceeds, "in each and every
such case, it shall and may be lawful for such person or
persons, or their legal representatives, to present a petition to
the district court of the state of Missouri, setting forth fully,
plainly and substantially, the nature of his, her or their
claim to the lands, tenements or hereditaments, and particu-
larly stating the date of the grant, concession, warrant or order
of survey under which they claim, the name or names of any
person or persons claiming the same, or any part thereof, by a
different title from that of the petitioner, or holding possession
of any part thereof, otherwise than by the leave or permission
of the petitioner; and also, if the United States be interested,
on account of the lands within the limits of such claim, not
claimed by any other person than the petitioner; also the
quantity claimed, and the boundaries thereof, when the same
may have been designated by boundaries; by whom issued,
and whether the said claim has been submitted to the exami-
nation of either of the tribunals which have been constituted

by law for the adjustment of land titles, in the present limits of the state of Missouri, and by them reported on unfavourably, or recommended for confirmation."

It has been already stated, that this act does not define the jurisdiction conferred on the court of East Florida by the act of 1830, but directs the mode of proceeding and the rules of decision. Consequently those technical averments which are required in the pleadings to show the jurisdiction of a court of limited jurisdiction are not indispensable, and it will be sufficient if the petition state a case substantially within the law. The court is satisfied that the petition of George J. F. Clarke is in this respect unexceptionable. It complies, we think, with all the requisites of the law.

The grant which constitutes the foundation of the petitioner's claim, is a complete title, subject to no condition whatever, emanating from the governor of East Florida, who was the lawful authority of his catholic majesty, for making grants and concessions of land, in that province. The decree of the district court, so far as it affirms the validity of this grant, is, we think, correct. But it appears to us to confirm the title of the petitioner to lands not comprehended within it.

In his original application to governor Coppinger, the petitioner describes with precision the land he solicits. The decree conforms to the petition, and the full title to both. That instrument, after stating the prayer of Clarke, adds, "and having pointed out a competent tract on the west side of St John's river, above Black creek, at a place called White Spring, that is vacant, &c., therefore I have resolved to grant, as in the name of his majesty I do grant, to the said George Clarke, the aforementioned five miles square of land, for himself, his heirs and successors, in absolute property, and I do issue, by these presents, a competent title, whereby I separate the royal domain from the right and dominion it had to said lands," &c.

Afterwards, on the 25th of January 1819, he again presented a petition to the governor, stating, that having examined the lands in the neighbourhood of White Spring, he finds that their extension back, is in no wise adequate to the expectation and intentions he had formed, nor the purposes for which they were granted to him, by the government; and furthermore,

he fears that they will interfere with the lands appertaining to the house of John Forbes & Co., therefore he prays "that the survey made in pursuance of an order granted by the governor, should be verified, with this only difference, that the depth back will be contracted to about one and a half miles, and that the said surveyor will survey the balance in the hammocks called langs and cones, situated on the south of Mizzel's lake, which are vacant."

The prayer of the petitioner was granted, and the surveys were made. The plats were laid before the district court, and show that one, containing eight thousand acres, was surveyed within the bounds of the grant. Two others, one for five, and the other for three thousand acres, were surveyed elsewhere. The judge confirmed the title of the petitioner to the three surveys.

The grant conveyed to Clarke the land described in the instrument, and no other. A permit to survey other lands, can be considered only as a new order of survey, depending for its validity on the power of the person who made it. On the 25th of January 1819, governor Coppinger did not possess this power. The treaty of February 1819, had declared that all grants (concessions) made after the 24th of January 1818, should be null and void. The acts of congress forbid the allowance of any order of survey made after that date. So much of the decree as sanctions these two surveys of five and three thousand acres, is in our opinion, erroneous.

But we do not think these irregular surveys affect the title under the original grant, unless the lands have been acquired by others. The vacant lands within its bounds, still belong to the appellee, and may now be surveyed by him.

It is the opinion of this court, that there is no error in so much of the decree of the superior court for the district of East Florida, pronounced in this case in May term 1832, as doth order, adjudge and decree that this claim is valid, and as confirms the same unto the claimant, to the extent, and agreeably to the boundaries as in the grant for the said lands, and in the plat of survey thereof, made by Don Andrew Burgevin, of eight thousand acres, and dated the 24th of February 1817, and that so much of the said decree ought to be affirmed, and it is hereby affirmed accordingly. But that so much of

the said decree as confirms to the claimant the lands contained in two other surveys thereof, made by the said Don Andrew Burgevin ; one for five thousand acres, on the 10th of March 1819, and the other for three thousand acres, on the 12th of the same month ; is erroneous and ought to be reversed, and the same is hereby reversed accordingly ; and the cause is hereby remanded to the said district court, with directions to take farther proceedings therein, in such manner that the residue of the said granted land be surveyed to the said petitioner, within the limits of the grant. All which is ordered and adjudged by this court.

This cause came on to be heard on the transcript of the record from the superior court for the eastern district of Florida, and was argued by counsel ; on consideration whereof, this court is of opinion, that there is no error in so much of the decree of the said court, pronounced in May term 1832, as doth adjudge and decree that the claim of the petitioner in that court is valid, and in so much thereof as confirms the same unto the claimant, to the extent and agreeably to the boundaries as in the grant for the said lands, and in the plat of survey thereof, made by Don Andrew Burgevin, of eight thousand acres, and dated the 24th of February 1819, filed in this cause, and that so much of the said decree ought to be affirmed, and it is hereby affirmed accordingly. But that so much of the said decree as confirms to the claimants the lands contained in two other surveys thereof, made by the said Don Andrew Burgevin, filed also in this cause, one for five thousand acres on the 10th of March 1819, and the other for three thousand acres on the 12th of the same month, is erroneous, and ought to be reversed, and the same is hereby reversed accordingly ; and this court doth remand the said cause to the said superior court, with directions to conform to this decree, and to take such further proceedings in the premises, that the remaining eight thousand acres, which have been improperly surveyed without authority, be surveyed on any lands now vacant within the limits of the grant made to the petitioner on the 6th of April 1816, and that the title of the petitioner to the land so surveyed be confirmed. All which is ordered, adjudged and decreed by this court.