**Robert Wayne O'FERRELL and Mary Ann Martin,[1] Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. Civ.A. 92–A–1450–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Nov. 24, 1998.

---

1. Mary Ann Martin was the wife of Robert Wayne O'Ferrell at the time of the investigation giving rise to this suit and was originally named as Mary Ann O'Ferrell. The O'Ferrells have divorced and she has since remarried.

G. William Gill, Montgomery, AL, for plaintiffs.

Ken Vines, Leura Garrett, Rand Neeley, AUSA, Montgomery, AL, for defendant.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

ALBRITTON, Chief Judge.

#### *Introduction and Background*

This suit for damages under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., came before the court for nonjury trial on November 16–19, 1998. The Plaintiffs' lawsuit has been active for six years. The matters before the court in this trial are considerably different now than they were when the litigation began. Many of the Plaintiffs' claims were dismissed prior to this trial. Thus, the court feels that it is appropriate to review the background of this lawsuit before turning to the resolution of the claims which are presently before the court.

This suit arises out of the FBI investigation into the mail bombing assassination of United States Circuit Judge Robert S. Vance and attorney Robert E. Robinson in December of 1989. In January, 1990, an intensive investigation of the Plaintiffs was conducted by a large number of government agents in Enterprise, Alabama. It was accompanied by wide-spread local, national, and international publicity identifying Mr. O'Ferrell as a suspect. Walter Leroy Moody was later arrested for the murders and the Plaintiffs were advised that they were no longer targets of the investigation. Moody was tried and convicted. The Plaintiffs contend that they were damaged by the nature of the investigation.

The Plaintiffs filed a Complaint pro se on November 20, 1992. Because of the serious nature of the Plaintiffs' allegations of governmental wrongdoing, this court appointed counsel for the Plaintiffs on February 19, 1993. The Plaintiffs subsequently filed an Amended Complaint on April 29, 1993, naming the United States and various unnamed federal agents as Defendants. In their Amended Complaint, the Plaintiffs asserted a breach of contract claim relating to reward money and numerous tort claims arising out of the FBI's conduct during its investigation of Mr. O'Ferrell. Specifically, the Plaintiffs asserted tort claims based on alleged leaks and disclosures to the media by FBI agents, inappropriate tactics during the interrogation of the Plaintiffs, negligent supervision of the FBI agents who conducted the investigation, the FBI's monitoring of a telephone conversation between the Plaintiffs, the FBI's closing of the Plaintiffs' business for four days during its search, and the FBI's entry onto the Plaintiffs' property and seizure of various items of personal property from their home and business pursuant to search warrants.

During the course of this litigation, the Plaintiffs have been given wide-ranging access to FBI files, including thousands of documents, and have been allowed to take the depositions of many agents.

#### *Sovereign Immunity*

In the early stages of the litigation, the United States moved for summary judgment on the basis that all of the Plaintiffs' claims were barred by sovereign immunity, stripping this court of its jurisdiction to hear the claims. Because of the doctrine of sovereign immunity, the United States is immune from suit unless it consents to be sued.

The doctrine of sovereign immunity, which holds that the State cannot be sued without its consent, has its roots in English common

law. The doctrine emerged through the American common law and has been recognized since the early days of our republic.

The Supreme Court announced the basic tenet of sovereign immunity for the federal government as early as 1821. *See Cohens v. Virginia,* 6 Wheat. 264, 19 U.S. 264, 411–12, 5 L.Ed. 257 (1821) ("The universally received opinion is, that no suit can be commenced or presented against the United States...."). And in *United States v. Clarke,* 33 U.S. 436, 444, 8 Pet. 436, 8 L.Ed. 1001 (1834), the Court stated, "As the United States are not suable of common right, the party who institutes such suit must bring this case within the authority of some act of congress, or the court cannot exercise jurisdiction over it."

Thus, a litigant who seeks to bring a claim against the United States must demonstrate to the court that the United States has consented to be sued on such claims. The terms of the government's consent define the court's jurisdiction to entertain the suit. *See United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941). If the United States has not consented to be sued on a claim, the court lacks jurisdiction to hear the claim, under the doctrine of sovereign immunity.

### The Federal Tort Claims Act

By enacting the Federal Tort Claims Act, Congress created a limited waiver of sovereign immunity allowing claims to be filed against the United States "for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2671 et seq. Such suits are required to be tried by a federal district judge, without a jury.

Congress, however, enacted several exceptions to this waiver of immunity, two of which the United States asserted in its Motion for Summary Judgment. First, the United States asserted that all of the Plaintiffs' claims fell under the discretionary function exception to the FTCA set forth in 28 U.S.C. § 2680(a). That provision excepts from the FTCA's waiver of sovereign immunity claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Second, the United States asserted that certain of the Plaintiffs' claims fell within the intentional torts exception to the FTCA set forth in 28 U.S.C. § 2680(h).

If an exception applies to a claim, then the court lacks jurisdiction to hear that claim because the United States has not waived its sovereign immunity and cannot be sued on that claim. The exceptions to the FTCA represent situations where Congress decided that it was in the public interest to limit an individual's ability to sue the United States. With the intentional torts exception, Congress determined that the United States should not be held responsible for specified intentional tortious acts by federal employees. With the discretionary function exception, Congress chose to immunize the United States from claims based on certain situations which required the exercise of a government employee's judgment.

### Previous Rulings by the Court

In its Order dated June 26, 1997, published as *O'Ferrell v. United States,* 968 F.Supp. 1519 (M.D.Ala.1997), this court addressed the applicability of these exceptions to the Plaintiffs' claims.

The court found that several of the Plaintiffs' claims fell within the discretionary function exception to the FTCA, and thus were barred because of sovereign immunity. This court dismissed the following claims as barred by the discretionary function exception: (1) claims based on inappropriate statements made during the interrogation of the Plaintiffs; (2) claims based on negligent supervision of the FBI agents who conducted the investigation; and (3) an invasion of privacy claim based on monitoring by FBI agents of a telephone conversation between the Plaintiffs.

By enacting the discretionary function exception, Congress sought to prevent judicial second-guessing of decisions by government

officials, when those decisions involve an exercise of judgment based on considerations of public policy. Significantly, Congress decided that this exception should apply even if the challenged conduct was negligent, wrongful, intentional, or an abuse of discretion. Thus the discretionary function exception immunizes the United States from tort claims based on certain acts by government employees.

■ A court applies a two-part test to determine whether the discretionary function exception applies to challenged government conduct. *O'Ferrell,* 968 F.Supp. at 1526–27. First, the court must look to the nature of the challenged conduct, not the subjective intent of the government actor, and consider whether it involves an element of judgment or choice. The exception does not apply if a federal statute, regulation, or policy prescribes a certain course of action; nor will it apply if constitutional law prohibits the challenged conduct. Second, if the challenged conduct involves an element of judgment or choice, the court must determine whether the conduct is of the kind that the discretionary function exception was designed to shield. The exception protects only governmental actions and decisions based on considerations of public policy.

The crux of the Plaintiffs' complaints against the Government, as Mrs. Martin testified at this trial, involved the manner in which the FBI conducted its investigation. Primarily, the Plaintiffs asserted that the investigation was unnecessarily broad, intrusive, and heavy-handed, and was accompanied by intensive media scrutiny. They alleged that during their interrogations, FBI agents told them they would get the electric chair if they did not acknowledge their role in the bombings and represented to one spouse that the other had confessed. They also complained about the invasion of their privacy, particularly in reference to the monitoring of a telephone call.

The court noted in its earlier decision on summary judgment, based on an analysis of the language of the statutes and on prior court decisions which bind the court, that generally how law enforcement officers conduct an investigation involves discretion. Decisions about which leads to follow, who should be interviewed, what questions to ask,

what statements to make, how long to continue, and the like, all require the exercise of judgment. Thus the tactics which the FBI employed in the VANPAC investigation involved an element of judgment or choice on the part of government employees. Furthermore, the court determined that deciding what tactics to use during an investigation into mail bombings which killed two people and threatened the lives of many more was the kind of decision which the discretionary function exception was designed to shield. Such decisions were based on public policy, namely the important goal of ensuring public safety and punishing those responsible for the mail bombings.

In holding that claims based on the FBI's tactics fell within the discretionary function exception, this court did not signal its approval of those tactics. The court recognized that some of those tactics may have been inappropriate or an abuse of discretion. But Congress expressly stated that the discretionary function exception applies even if the challenged conduct was inappropriate or involved an abuse of discretion. Thus, Congress has immunized the United States from suit on such claims, and this court held that it lacked jurisdiction to hear those claims.

Similarly, the court determined that the discretionary function exception applied to claims based on negligent supervision. The method which the FBI chooses to supervise its agents involves discretion and considerations of public policy. The United States, therefore, has sovereign immunity, and cannot be sued, as to claims based on the negligent supervision of FBI agents, since Congress has not chosen to waive that immunity.

Regarding the intentional torts exception to the FTCA's waiver of sovereign immunity, the court noted that the FTCA does not apply to any claim, if based on acts or omissions of law-enforcement officers, arising out of libel, slander, misrepresentation, deceit, or interference with contract rights. *O'Ferrell,* 968 F.Supp. at 1527. The court found that the Plaintiffs' allegations that FBI agents and other government officials made misleading statements through leaks and disclosures to the media fell within this exception. All of the Plaintiffs' claims relating to use of the

media concerned injury to reputation through the communication of an idea. Thus, these claims arose out of libel and slander.

Similarly, claims relating to the Plaintiffs' inability to transact business because of the temporary closing of their shop fell within the intentional torts exception because those claims arose out of interference with contract rights. Because those claims fell within an exception to the FTCA's waiver of sovereign immunity, the court dismissed those claims for lack of subject matter jurisdiction. The court also dismissed the Plaintiffs' breach of contract claim, alleging entitlement to a reward, as being within the sole jurisdiction of the United States Court of Federal Claims.

The only claims which survived the Defendant's Summary Judgment Motion were those based on the alleged illegal search and seizure of the Plaintiffs' property. The court refused to dismiss those claims under the discretionary function exception because, when viewing the evidence in a light most favorable to the Plaintiffs, a genuine issue of material fact existed as to whether the FBI agents had discretion to conduct a search.

The Plaintiffs submitted some evidence that the FBI had intentionally or recklessly included a false statement on the affidavit used to support the search warrants. If there were no probable cause for the issuance of the warrants once the intentionally or recklessly false statements in the affidavit had been stricken, the United States searched the Plaintiffs' property pursuant to an invalid warrant. Such a search would be in violation of the Fourth Amendment to the Constitution, and the discretionary function exception does not apply to conduct which is specifically prohibited by the Constitution.

Subsequent to the court's Order, the Plaintiffs added claims based on the acquisition of Mr. O'Ferrell's blood, hair, and saliva samples pursuant to a grand jury subpoena. Additionally, the Plaintiffs amended their Complaint to assert claims against Stephen Brannan under a Bivens theory, which allows a plaintiff to sue individual federal government agents for violation of a person's constitutional rights. The suit was allowed to proceed against Mr. Brannan on the theory that he had obtained the search warrant by intentionally misrepresenting facts.

In its Order dated November 3, 1998, this court dismissed all claims against Mr. Brannan. The court found that the Plaintiffs had no evidence that Mr. Brannan intentionally misrepresented the truth about a typewriter match in his affidavit. Thus, Mr. Brannan was entitled to qualified immunity because he was performing discretionary functions and his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The Plaintiffs have not pursued a Bivens action against any other individual FBI agent or government official. The sole remaining Defendant is the United States.

### The Claims at Trial

There are three causes of action before the court in this trial. They are: Count One— Trespass, Invasion of Privacy, Outrage, and Negligence claims based on an alleged illegal search of the Plaintiffs' business and home; Count Two—Assault, Battery, and False Imprisonment claims arising out of the alleged involuntary acquisition of blood, hair, and saliva samples from Mr. O'Ferrell pursuant to an illegally-obtained search warrant and/or grand jury subpoena; and Count Three— Conversion, Invasion of Privacy, Intentional Infliction of Emotional Distress, and Negligence claims arising out of the alleged illegal seizure and/or retention of the Plaintiffs' personal property.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon a careful consideration of the testimony and exhibits presented at trial and the relevant law, the court makes the following findings of fact and conclusions of law:

On December 16, 1989, Judge Robert S. Vance of the United States Court of Appeals for the Eleventh Circuit was killed and his wife, Helen Rainey Vance, was seriously injured by a mail bomb delivered to their home in Mountain Brook, Alabama. On December 18, 1989, attorney Robert E. Robinson was killed after receiving a mail bomb in Savannah, Georgia. On that same day, a mail

bomb was delivered to the Eleventh Circuit Court of Appeals in Atlanta, Georgia. On December 19, 1989, the National Association for the Advancement of Colored People's Regional Office in Jacksonville, Florida received a mail bomb. Government agents disarmed the latter two mail bombs.

Several death threat letters to various Eleventh Circuit judges and others, as well as a letter claiming responsibility for the mail bombings, were subsequently mailed. The death threat letters mailed to the judges stated:

> Judge: Americans for a Competent Federal Judicial System shall assassinate you because of the federal courts' calloused disregard for the administration of justice. 010187.

The Federal Bureau of Investigation began an investigation into the mail bombings, referred to as the VANPAC investigation. William Bodziak, a certified document examiner and an FBI special agent assigned to the document section of the FBI laboratory, began analyzing typewritten documents recovered during the VANPAC investigation. Among the documents recovered were the address labels on the bomb packages and the death threat letters mailed to the Eleventh Circuit judges with their accompanying envelopes. The documents were referred to during the trial, and will be referred to herein, as the "bomber documents."

Special Agent Bodziak determined that the bomb package labels and the judge death threat letters had been typed on the same typewriter. To make that determination, Mr. Bodziak measured the horizontal spacing of the typewritten characters on documents which he received. He determined that the horizontal spacing on the bomb package labels and judge death threat letters measured 2.35 millimeters. Based on his experience as a document examiner, Mr. Bodziak determined that the 2.35 millimeter spacing was unique to certain typewriters manufactured by Brother Industries, a Japanese manufacturer, and that this spacing was not used by any other typewriter manufacturer. Thus, he concluded that the bomber documents were typed on a Brother typewriter.

Next, Mr. Bodziak consulted the FBI typewriter standards file. The FBI standards file contained a collection of different typewriter styles, categorized by style and spacing, enabling a document examiner to take an item of typewriting and determine in most cases what brand manufacturer was the source. Mr. Bodziak compared the bomber documents to the standards under 2.35 millimeter spacing. He found that all of the typewritten characters on the bomber documents matched the standards for a specific style of Brother Industries manual typewriter, with the exception of the numeral one.

The numeral one on the bomber documents had an unusual appearance and was not part of the standards in the FBI file. Mr. Bodziak called a representative of Brother Industries in New Jersey in December of 1989 and described the unusual character. This representative advised Mr. Bodziak that Brother Industries had never manufactured a version of that typewriter with the unusual numeral one. Mr. Bodziak concluded that the numeral one was a replacement character, unique to the individual typewriter on which the bomber documents had been prepared. He considered the numeral one to be the primary identifying characteristic on the bomber documents, although he noted several other characteristics which could aid in finding matching documents.

Special Agent Bodziak created a search sheet which listed certain characteristics for agents to look for when searching for typewritten documents which had the same style of type as the bomber documents. The search sheet described the unusual numeral one as a replacement character. The FBI conducted a comprehensive search of filings in the Eleventh Circuit and other documents in an effort to locate matching samples. As part of this search, FBI Special Agent Bob Thompson led a team of FBI agents to Atlanta to search Eleventh Circuit files of cases in which Judge Vance had participated.

On January 19, 1990, an agent located documents which potentially matched the criteria on the search sheet. Special Agent Thompson notified the FBI's Atlanta field office and decided to carry the documents to FBI headquarters in Washington, D.C. The documents discovered in Atlanta were a filed photocopy of a typewritten Notice of Appeal

in the case of *O'Ferrell v. Gulf Life Insurance Company* and the accompanying original envelope.

In Mr. O'Ferrell's suit against Gulf Life Insurance Company, a judge in the United States District Court for the Middle District of Alabama ruled against Mr. O'Ferrell. Mr. O'Ferrell, representing himself, filed a Notice of Appeal to the Eleventh Circuit, and his appeal was later rejected by a panel on which Judge Vance was the senior judge.

Special Agent Thompson arrived at FBI headquarters on the afternoon of January 19, 1990. He provided Special Agent Bodziak with the documents. Mr. Bodziak began comparing the O'Ferrell documents with the bomber documents to determine if there was a match. Mr. Bodziak's examination of the documents which Mr. Thompson delivered lasted several hours. Later in the evening of January 19, two other agents arrived with additional typewritten documents relating to the O'Ferrell case which the FBI retrieved after the potential match had been discovered. Special Agent Houston delivered an original copy of the Notice of Appeal, and Special Agent Lefebvre delivered an original copy of a Notice of Appeal and another envelope addressed to attorney C. Stewart.

These documents which were delivered to Mr. Bodziak for comparison to the bomber documents were referred to at trial, and will be referred to herein, as the "O'Ferrell documents."

Special Agent Bodziak concluded that the O'Ferrell documents and the bomber documents had been typed on the same typewriter. The primary basis for Mr. Bodziak's conclusion was the unique numeral one, though he noted other similarities in his Lab Report. He communicated his findings to the duty officer at the Strategic Investigation Operations Center (SIOC), which was set up at the FBI headquarters. SIOC served as the coordination center for the VANPAC investigation. Special Agent Bodziak also participated in a meeting held in a conference room at SIOC around 2:00 a.m. on January 20, 1990.

Based on the determination of a typewriting match, Mr. O'Ferrell became a primary suspect in the FBI's mail bombings investigation. On the morning of January 20, 1990,

FBI Special Agent Stephen Brannan, who was in charge of the FBI investigation out of the Birmingham, Alabama, office, spoke with SIOC and received information about the laboratory's findings. SIOC informed Brannan that the lab had concluded that the typewritten documents matched. Mr. Brannan included the information concerning a match in an affidavit which he prepared to support a search warrant of Mr. O'Ferrell's property.

Special Agent Brannan completed his affidavit, and Magistrate Judge John Carroll issued search warrants on the basis of that affidavit on January 20, 1990. Judge Carroll subsequently issued additional search warrants also on the basis of the affidavit. FBI agents executed the search warrants by searching the Plaintiffs' business, residence, automobile, septic tank, and field lines, beginning January 22, 1990.

On January 22, 1990 a grand jury subpoena was issued for Mr. O'Ferrell to produce certain items, including samples of his hair, blood, and saliva. On January 30, 1990, Mr. O'Ferrell produced those samples at an Enterprise hospital. Mr. O'Ferrell had obtained counsel on January 25, 1990. He produced the samples requested in the grand jury subpoena with his counsel present.

Despite an exhaustive search of the Plaintiffs' property, several interrogations of the Plaintiffs, and hundreds of interviews with the Plaintiffs' family, friends, and associates, the FBI never found any evidence that would link the Plaintiffs to the bombings. On October 9, 1990, the United States Department of Justice notified the Plaintiffs that they no longer were considered targets of the mail bombings investigation. Walter Leroy Moody subsequently was convicted on charges stemming from the mail bombings. Moody had been a suspect from the early stages of the investigation.

In the fall of 1990, Special Agent Bodziak visited the Brother Industries plant while on a trip to Japan and Australia on several cases. During a discussion of VANPAC, it was discovered that the unusual numeral one on the bomber and O'Ferrell documents had actually been an original character on a limited number of Brother Industries typewriters

manufactured between 1961 and 1962. A paper authored by Jan Beck, found in the files at Brother Industries, suggested that the company produced approximately 3,000 such typewriters.

The typewriter which was the source for the bomber and O'Ferrell documents was never found.

### The Search Warrants

The primary issue remaining before the court concerns the validity of the search warrants which allowed the United States to search the Plaintiffs' property. If the search warrants were legally obtained, then, as the court has previously noted, the United States cannot be held liable for the manner in which the search was carried out.

■ In *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that if a person challenging the veracity of a warrant affidavit establishes that the affiant included in the affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided ... as if probable cause was lacking on the face of the affidavit." False statements made negligently or by innocent mistake, however, are insufficient to invalidate a warrant.

In support of obtaining a search warrant for the Plaintiffs' business, the United States submitted the affidavit of Stephen Brannan to the magistrate judge. The key paragraph in the affidavit stated as follows:

> On January 19, 1990, the FBI laboratory determined that the envelope postmarked "Dothan, Alabama 363 PM 17 Aug 1988" addressed to the United States District Court Middle District of Alabama and the two notices of appeal, dated July 13, 1988, and signed by Robert Wayne O'Ferrell, were prepared on the same typewriter that was used to prepare the labels on the package bombs sent to Judge Vance, Robert Robinson, the Clerk's Office of the 11th Circuit Court of Appeals, and the NAACP Regional Office in Jacksonville, Florida, and it was also used to prepare the Decem-

ber threat letters sent to the judges of the 11th Circuit Court of Appeals.

Plaintiffs' Exhibit 23, ¶ 39.

■ If the FBI lab or a government agent made at least a recklessly false statement to Special Agent Brannan which was incorporated into the affidavit, the false material should be set aside and the search warrant invalidated if the remaining material in the affidavit is insufficient to establish probable cause. It is uncontested that the affidavit of Brannan, without ¶ 39, would be insufficient. Reckless disregard for the truth in this context occurs where a government agent or instrumentality harbored or should have harbored serious doubts about the truth of a statement but made the statement anyway. *O'Ferrell v. U.S.*, 968 F.Supp. at 1533 (M.D.Ala.1997) (citing *United States v. Kirk*, 781 F.2d 1498, 1503 (11th Cir.1986)).

Before the court reaches the issue of recklessness, however, the Plaintiffs must establish that statements in the affidavit were false. The Plaintiffs allege that there never was a typewriter match, and thus the statement indicating that there was a match was false. Based on the evidence before the court, the court finds that the Plaintiffs have not carried their burden of proving that the typewriter which the Plaintiffs used to create their Notices of Appeal was different from the typewriter which the bomber used to create the bomb labels and threatening letters.

The Plaintiffs base their assertion of a false statement on Special Agent Bodziak's belief in January 1990 that the unusual numeral one in the two sets of documents was a replacement character. Because Mr. Bodziak subsequently discovered that the unusual numeral one had been original equipment on a limited number of typewriters, the Plaintiffs claim that he was mistaken in determining that there was a match between the two sets of documents. At numerous points in his testimony, however, Mr. Bodziak maintained that he still believes the bomber documents and the O'Ferrell documents came from the same typewriter. Thus, the court has heard evidence from a certified documents examiner that the documents in question matched, based on reasons detailed in his testimony.

As reasons for maintaining the validity of the match, Mr. Bodziak mentioned the limited number of typewriters manufactured with the unusual numeral one; the significant time lapse between 1962 when the manufacturer ceased making these typewriters and the late 1980's when the O'Ferrell documents and the bomber documents were typed; the poor quality of that vintage typewriter and the lessened likelihood that those typewriters could survive for such a time period; the fact that FBI agents screened tens of thousands of documents from various parts of the country and never located other Brother style typewritten documents which contained the unusual numeral one; and other similarities between the documents pertaining to the letters A, J, P, R, and S, and the numerals three and four.

To prove that the statement in the Brannan affidavit was false, the Plaintiffs must do more than show that the original basis for Special Agent Bodziak's determination of a match was incorrect. They must prove that the conclusion itself was incorrect. The statement that the FBI lab determined a match was true. Therefore, it is not sufficient to prove that that determination was recklessly made; it first must be proved that the determination itself was false, that there was not a match between the O'Ferrell documents and the bomber documents. Only then would the issue of whether the determination was recklessly made become relevant.

The Plaintiffs have asserted that there were some variations between certain characteristics in the documents. Mr. Bodziak explained, however, that such variations are expected with old manual typewriters, especially when there has been a time lapse such as the 16-month period between the creation of the O'Ferrell documents and the bomber documents.

■ The Plaintiffs produced no credible affirmative evidence refuting Mr. Bodziak's conclusions.[2] Plaintiffs were given complete access to the questioned documents for the purpose of having them examined by experts. They have produced no one who disagreed

with the opinion of the FBI's certified document examiner that there was a match. The court finds from the evidence that there was, in fact, a match, that the O'Ferrell documents and the bomber documents were typed on the same typewriter. Accordingly, this court finds that the Plaintiffs have not established that the statements in the Brannan affidavit were false.

In the absence of proof that the statements in Brannan's affidavit were false, the search and seizure of the Plaintiffs' property was constitutional under the Fourth Amendment. Magistrate Judge Carroll determined that there was probable cause for the issuance of the search warrants, and this court agrees. That being the case, the search was legal. The court finds that all claims relating to the illegal search and seizure fall within the discretionary function exception to the FTCA and are barred by sovereign immunity.

■ The decision to search the Plaintiffs' home and business as part of the mail bombings investigation involved an element of judgment or choice. No federal statute, regulation, or policy prescribed a certain course of action regarding the conduct of the investigation. Moreover, the decision to swear out and execute a search warrant as part of a criminal investigation is the kind of conduct that the discretionary function exception was designed to shield because it involves considerations of public policy.

■ Even if the Plaintiffs had established that the affidavit contained a false statement concerning the typewriter match, they have not proven that the false statement resulted from at least reckless disregard for the truth. The Plaintiffs' allegation of recklessness on the part of the United States turns on Special Agent Bodziak's initial belief that the unusual numeral one was a replacement character. Mr. Bodziak has shown that he based his opinion in part on information contained in the FBI standards file. No evidence establishes that there was recklessness involved in the maintenance of the FBI stan-

2. There was some testimony concerning an affidavit of a typewriter repairman, John Phillips, expressing an opinion that the documents derived from different typewriters. In light of Mr. Phillips' deposition, however, where he com-

pletely contradicts his earlier statements and testifies that the documents could have been typed on the same typewriter, the court finds Mr. Phillips' earlier statements, even if they were admissible, to be unworthy of credence.

dards file. Thus, the Plaintiffs must base their claim on the conduct of Special Agent Bodziak.

The court finds that William Bodziak was a competent certified document examiner in 1989–90. He completed a three-year training period on document examination from 1973–76. He had been assigned to the document section of the FBI laboratory for 16 years when the mail bombings occurred. He testified that analysis of typewritten documents was part of his daily activity in the lab. Moreover, he testified that he is a member of numerous organizations for document examiners.

Mr. Bodziak originally believed that the unusual numeral one in the bomber documents was a replacement character unique to the typewriter which produced the documents. He based that determination on the information in the FBI typewriter standards file, which he believed to be the most comprehensive collection of typewriter standards available to a document examiner. He contacted Brother Industries, initially in December 1989 and again in April 1990. Both times the manufacturer informed him that the company had never produced a typewriter with the unusual numeral one. Subsequently, Mr. Bodziak learned on a trip to Japan that the unusual numeral one had been an original character on a limited number of Brother Industries typewriters manufactured between 1961 and May 1962.

The Plaintiffs have shown that there were other sources available in the FBI laboratory, in addition to the standards file, which Mr. Bodziak did not consult. This court, however, does not find that Special Agent Bodziak acted recklessly by not searching other sources after he consulted what had been described to him as the most comprehensive source available and then contacted the manufacturer of the typewriter concerning his findings.

The Plaintiffs also have produced evidence that Special Agent Bodziak made notes during his examination, most of which were never located or produced by the Government. Additionally, the Plaintiffs have shown through the testimony of Bill Bounds that the duty officers in SIOC often completed activity records when events of significance occurred. The Government failed to produce any SIOC activity records for January 19, 1990–January 21, 1990. In the light of all the evidence concerning Mr. Bodziak's determination of a match, however, the court will not make the significant leap which the Plaintiffs request-that the absence of certain notes indicates intentional deception concerning the match.

Special Agent Bodziak's determination that there was a match between the typewritten documents was not the result of recklessness or intentional misconduct. Even if false, the determination of a match would not be stricken from the affidavit which provided the basis for the search warrant. Thus the searches were pursuant to a valid search warrant. For the reasons given above, the court concludes that the discretionary function exception applies, and the court lacks jurisdiction to hear these claims.

### The Conversion Claim

█  Additionally, the Plaintiffs' claims for conversion and detention of property fall within the exception to the FTCA set forth in 28 U.S.C. § 2680(c). Section 2680(c) provides that the FTCA's waiver of sovereign immunity shall not apply to "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement officer." In *Schlaebitz v. United States,* 924 F.2d 193, 194–95 (11th Cir.1991), the Eleventh Circuit held that the phrase "other law enforcement officer" applied broadly to include all federal law-enforcement officers, not just those working in customs or performing customs-related duties. Thus, section 2680(c) applies to the FBI officers who seized the Plaintiffs' property in this case and to the subsequent detention of that property.

The court in *Schlaebitz* further stated that section 2680(c) applies to claims "based on the detention of goods by law enforcement officers in the performance of their lawful duties." *Id.* at 195. The FBI agents who seized the Plaintiffs' property were performing their lawful duties by executing valid search warrants. Thus, the Plaintiffs' claims for conversion and detention of goods fall

within this exception to the FTCA. Congress has not waived sovereign immunity as to the claims, and the court lacks subject matter jurisdiction.

### The Grand Jury Subpoena

■ The Plaintiffs' claims concerning the grand jury subpoena present a different issue. On January 22, 1990, the United States procured a grand jury subpoena requiring Mr. O'Ferrell to produce samples of his blood, saliva, and hair. Though no courts had addressed the issue prior to 1990, at least two federal district courts have since determined that a grand jury subpoena is insufficient to compel the production of blood or saliva samples. *See United States v. Nicolosi*, 885 F.Supp. 50 (E.D.N.Y.1995); *In re Grand Jury Proceedings (T.S.)*, 816 F.Supp. 1196 (W.D.Ky.1993); These courts reasoned that the Fourth Amendment applied to intrusive procedures such as extracting blood, requiring a showing of probable cause. A grand jury subpoena does not require such a showing and thus offers insufficient protection of an individual's Fourth Amendment rights.

A grand jury subpoena may not be the appropriate means by which the government may compel the production of an individual's blood or saliva samples, but this court does not need to decide that issue in this case. Mr. O'Ferrell could have moved this court to quash the subpoena. Such a motion would have allowed a court to review the subpoena for unreasonableness or oppressiveness. Mr. O'Ferrell, however, did not make a motion to quash the subpoena. Stephen Brannan testified that Mr. O'Ferrell appeared with counsel and voluntarily produced the samples. Though Mr. O'Ferrell testified that he did not recall whether his attorney was present, his testimony does not contradict Mr. Brannan's. The proper time to contest the subpoena has passed. The court will not hear a claim based on an improper grand jury subpoena when Mr. O'Ferrell complied with the subpoena on the advice of counsel.

### CONCLUSION

The court notes that it feels tremendous sympathy for what the Plaintiffs experienced. Through no fault of their own, Mr. O'Ferrell and Mrs. Martin had their lives turned upside-down and held open for public examina-

tion. Despite its exhaustive search, the FBI found no evidence to link the Plaintiffs to the bombings. The FBI privately acknowledged that the Plaintiffs were no longer targets in its investigation, and this court finds as a fact that Robert Wayne O'Ferrell and Mary Ann Martin were not knowingly involved in any way in the bombing deaths of Judge Robert S. Vance and attorney Robert E. Robinson.

The court further finds, however, that the same typewriter used by the Plaintiffs to type certain documents in their appeal in the case of *O'Ferrell v. Gulf Life Insurance Company* was used by someone else 16 months later to type the labels on packages containing the bombs and to type letters threatening to assassinate judges on the 11th Circuit Court of Appeals. Once the FBI's document examiner made that determination, the FBI would have been derelict in its duties to the public not to question the O'Ferrells and obtain search warrants to try to locate the typewriter. Even with Walter Leroy Moody already being viewed by some as a strong suspect as the actual bomber, the threat letters suggested the possibility of involvement by more than one person and also the possibility of more assassination attempts.

The court concludes that there was no violation of the Plaintiff's constitutional rights by the FBI in obtaining warrants to search the Plaintiffs' premises.

The reasonableness of the tactics used by FBI investigators in executing the warrants and in questioning the Plaintiffs and others, and the failure to publicly acknowledge the O'Ferrells' innocence under all the circumstances, may be legitimately debated. This court does not, and should not, however, make findings in this regard. The court's duty in this case is to apply the law as Congress has written it. And Congress has chosen to immunize the United States from tort claims based on discretionary acts by government agencies or employees which involve considerations of public policy, even when those actions constitute an abuse of discretion. Thus, these are matters which cannot be the basis of liability once it is established that the search warrants were lawfully obtained. It is within the province

of Congress, the elected representatives of the people, and not a court, to address whether any changes should be made in the law to allow suits against our government for alleged abuses of authority by its agents in cases such as this, and, if so, under what circumstances.

For the reasons stated, judgment will be entered in favor of the Defendant.