[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 11, 2001
THOMAS K. KAHN
CLERK

No. 99-6071

_____

D. C. Docket No. 92-01450-CV-A-S

ROBERT WAYNE O'FERRELL, MARY ANNE O'FERRELL,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(June 11, 2001)**

Before BARKETT and HULL, Circuit Judges, and POLLAK*, District Judge.

_____

*Honorable. Louis H. Pollak, U.S. District Court for the Eastern District of Pennsylvania, sitting by designation.

POLLAK, District Judge:

Plaintiffs Robert Wayne O'Ferrell and Mary Anne Martin (formerly Mary Anne O'Ferrell)[1] appeal from the District Court's grant of summary judgment dismissing a portion of their lawsuit, and from the District Court's subsequent dismissal of the balance of the lawsuit after a bench trial. The lawsuit was based on actions taken by federal law enforcement agents in 1990 when the plaintiffs were targets of a massive investigation of a group of mail bombings and attempted mail bombings that took place in December of 1989.

Tragically, two of the mail bombs hit their targets. On December 16, 1989, a mail bomb was received at the home of Robert S. Vance and Helen Rainey Vance in Mountain Brook, Alabama. The bomb killed Judge Vance – an eminent and revered member of this court – and severely injured Mrs. Vance. On December 18 a mail bomb killed Robert E. Robinson, a prominent Savannah attorney. On the same day a mail bomb arrived at this court's Atlanta courthouse; but, fortunately, the bomb was intercepted by federal law enforcement agents. On the next day, December 19, a mail bomb was received at the Jacksonville office of the National Association for the Advancement of Colored People ("NAACP"); happily, this

---

[1]In 1989 and 1990, when the events giving rise to this litigation occurred, the plaintiffs were married; subsequently, they were divorced. In this opinion, the term "the O'Ferrells" is used in reference to events that transpired in 1989 and 1990. The former Ms. O'Ferrell is identified as "Ms. Martin" in those portions of the opinion which refer to later events.

bomb was also intercepted and detonated. Concurrently, several members of this court received typed death threats: "JUDGE: AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM SHALL ASSASSINATE YOU BECAUSE OF THE FEDERAL COURTS' CALLOUSED DISREGARD FOR THE ADMINISTRATION OF JUSTICE. 010187."

## I. The Investigation and the Resultant Search Warrants

### A. The Initial Phase.

The FBI at once launched a widespread investigation. A central element of the investigation was intensive analysis of the typed bomb-package labels and the typed death-threat letters (collectively referred to by the District Court as "the bomber documents") that commenced in late December of 1989, almost immediately after the tragic events narrated above. Principal responsibility for this aspect of the FBI's investigation of the murders and death-threats rested with Special Agent William Bodziak, a certified document examiner who had been attached to the document section of the FBI laboratory in Washington for many years. On close scrutiny of the labels and the letters, Agent Bodziak's first significant observation was that all the typed documents displayed a uniform horizontal spacing of the typewritten characters of 2.35 millimeters. A spacing of 2.35 millimeters was an identifying element of a particular line of typewriters

produced by Brothers Industries, a Japanese typewriter manufacturer. Drawing upon a customary laboratory reference – the FBI typewriter standards file – Agent Bodziak determined that, with one outstanding exception, several observable features of the typewritten characters were commonly associated with a particular model Brothers Industries manual typewriter. The outstanding exception was an unusual numeral – a number one – unusual in that, projecting horizontally from the top of the vertical shaft, there was a very minute flag-shaped appendage. Agent Bodziak telephoned a Brothers Industries representative who informed Agent Bodziak that the number one he described had not been a feature of any Brothers Industries typewriter. So advised, Agent Bodziak concluded that the unusual numeral was a so-called "replacement character" – a character that becomes part of a typewriter's character array when a damaged striking lever is replaced and the replacement lever has a letter or number of a font unlike the font of the typewriter as manufactured.

In fact, the information supplied to Agent Bodziak by a Brothers Industries representative in December of 1989 (and reaffirmed in a subsequent conversation with a Brothers Industries representative in April of 1990) was inaccurate. The unusual number one was actually a regular element of a limited run of Brothers

Industries typewriters manufactured in 1961 and 1962.[2]  In all likelihood Agent Bodziak would have learned this in December of 1989 or January of 1990 had he, in addition to reviewing the FBI typewriter standards file, consulted certain other reference works available to those working in the FBI laboratory – most especially the *Haas Atlas* – but he did not do so.

Having concluded that the unusual number one was a replacement character, specially installed in a particular typewriter in substitution for a defective striking lever,  Agent Bodziak reasoned that there was probably only a single Brothers Industries typewriter that had that deviant number one.  A next step in tracing the suspect typewriter (and thereby its owner) was to try to determine whether, prior to the bombings, the suspect typewriter had been used to produce court documents in litigation before Judge Vance or other members of this court.  To aid FBI field agents in sifting through hundreds, or perhaps thousands, of court documents, Agent Bodziak prepared a guide that identified several indicative typeface characteristics, including the unusual number one, that appeared in the bomb-package labels and the death-threat letters that he had examined.

B.     The O'Ferrells Become Targets of the Investigation.

---

[2]Agent Bodziak did not learn this until he visited the Brothers Industries plant in Japan in the fall of 1990.

Agent Bodziak's guidance to the field bore fruit. In the course of the afternoon and evening of January 19, 1990, three agents arrived at the FBI laboratory and delivered five apparently pertinent documents (two agents had two documents apiece, and the third agent had one) to Agent Bodziak. The five documents (collectively referred to by the District Court as "the *O'Ferrell* documents") had been filed in different offices in connection with *O'Ferrell v. Gulf Life Ins. Co.*, No. 88-7435 (11 Cir. 1988), a case involving Robert O'Ferrell (the principal plaintiff in the case at bar) that had turned out unhappily for Mr. O'Ferrell. (*O'Ferrell v. Gulf Life Ins. Co.* was a case in which Mr. O'Ferrell pursued a *pro se* appeal to this court from an adverse judgment of the United States District Court for the Middle District of Alabama; the panel of this court to which the case was assigned – a panel of which Judge Vance was the senior member – dismissed the appeal on April 17, 1989). Three of the five documents were copies of notices of appeal (two original copies and one photocopy); the other two documents were envelopes for notices of appeal.

Agent Bodziak's examination of the five documents delivered on January 19 led him to conclude that they were typed on the same typewriter that had generated the bomb-package labels and the death-threat letters. Agent Bodziak noted a number of indicative common characteristics, but the crucial feature – the

6

*sine qua non* of his confident conclusion – was the unusual number one, which appeared in both sets of documents and which, believing it to reflect the replacement of a single damaged striking lever on a particular typewriter, Agent Bodziak felt to be dispositive.

In the early morning hours of January 20, Agent Bodziak presented his findings to a hurriedly convened meeting of the FBI headquarters group in overall charge of the investigation. Later that morning, Special Agent Stephen Brannan, the agent in charge of the Birmingham portion of the investigation, was informed by his Washington superiors that the FBI laboratory had determined that there was a match between the typed bomb-package labels and death-threat letters and the typed *O'Ferrell v. Gulf Life Ins. Co.* appeal papers. Utilizing this information, Agent Brannan at once prepared an affidavit in support of an application to Magistrate Judge John Carroll for search warrants authorizing searches of plaintiffs' home, salvage business and other areas under their control.[3] Magistrate

---

[3]Agent Brannan's affidavit contained the following recital:

> On January 19, 1990, the FBI laboratory determined that the envelope postmarked "Dothan, Alabama 363 PM 17 Aug 1988" addressed to the United States District Court Middle District of Alabama and the two notices of appeal, dated July 13, 1988, and signed by Robert Wayne O'Ferrell, were prepared on the same typewriter that was used to prepare the labels on the package bombs sent to Judge Vance, Robert Robinson, the Clerk's Office of the 11th Circuit Court of Appeals, and the NAACP Regional Office in Jacksonville, Florida, and it was also used to prepare the

7

Judge Carroll issued search warrants on January 20, and these were followed by others.

C.     Searches and Interrogations.

Searches of the O'Ferrells' home and business by FBI agents commenced on January 22, 1990. The tragic bombings having been national news, the searches attracted substantial media attention. FBI agents supplemented the searches with several interrogations of the O'Ferrells.

Apart from the asserted match of the typewritten documents, the FBI's investigation of the O'Ferrells appears to have generated no inculpatory information. On October 9, 1990, the O'Ferrells were advised that they were no longer targets of the investigation.

Subsequently, Walter Leroy Moody was arrested and charged with the bombings, and was ultimately convicted.

## II. Proceedings in the District Court

Believing that they had been mistreated in a variety of ways by federal law enforcement officials, the O'Ferrells, in November of 1992, filed a *pro se*

December threat letters sent to the judges of the 11th Circuit Court of Appeals.

8

complaint in the District Court for the Middle District of Alabama. The plaintiffs concurrently petitioned for leave to proceed *in forma pauperis,* which was granted. In February of 1993 the District Court appointed counsel to represent the plaintiffs. (In 1995, retained counsel entered an appearance and, thereafter, appointed counsel were permitted to withdraw). In April of 1993, two months after the appointment of counsel, an amended complaint was filed.

The amended complaint was brought against the United States and a group of unidentified "fictitious" defendants designated as defendants A to Z.

The causes of action asserted directly against the United States were of two kinds. One was a contract claim, in which the O'Ferrells alleged that the United States had offered a $500,000 reward for information leading to the apprehension of the bomber(s), and that Mary Ann O'Ferrell had supplied such information about the actual culprit, Walter Leroy Moody, but that the promised reward had not been forthcoming. The other causes of action asserted directly against the United States were several sets of claims arising under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680 – the statute which, by waiving the sovereign immunity of the United States, imposes tort liability on the United States in circumstances in which, under the law of the relevant state or territory, a private person would be liable; the tort liability of the United States is, however, narrowly

9

limited, Congress having exempted from liability any claims under several specified headings – *e.g.*, (and of particular importance in the case at bar) "libel," "slander," 28 U.S.C. § 2680(h), "detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement officer," 28 U.S.C. § 2680(c), and any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). One set of the O'Ferrells' FTCA claims charged that federal agents had fed to the media quantities of inculpatory information, much of it false. Other sets of claims charged that federal officials had, in the course of the investigation, (1) closed the plaintiffs' salvage business for several days; (2) trespassed – pursuant to search warrants said to be invalid – on plaintiffs' business and residential premises; (3) seized religious items from plaintiffs' residence when conducting the allegedly unlawful search; (4) threatened plaintiffs, with a view to inducing confessions; and (5) monitored a private telephone conversation between the plaintiffs. Further, plaintiffs charged that the United States had failed properly to supervise the conduct of its law enforcement agents.

The claims nominally directed against the numerous "fictitious" law enforcement agents were "*Bivens*" claims – *i.e.,* damage actions brought pursuant

to *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), alleging unconstitutional conduct by federal officials and seeking to impose liability on the defendant officials.

A.    The Summary Judgment Rulings.

Following the filing of the amended complaint, the government filed a motion to dismiss, or, in the alternative, for summary judgment. The parties filed numerous additional pleadings, supplemented by evidentiary submissions, both before and after plaintiffs' appointed counsel were replaced by present counsel. On June 26, 1997, the District Court ruled on the government's motion, treating it as a motion for summary judgment. *O'Ferrell v. United States*, 968 F. Supp. 1519 (M.D. Ala.1997). The District Court, after a careful analysis of the plaintiffs' claims, stated its dispositive rulings.

The District Court's first ruling was to direct that the plaintiffs' *Bivens* claims, which by hypothesis could only be pursued against individual law enforcement agents for their allegedly unconstitutional actions, be "DISMISSED to the extent that they may be asserted against the United States, for lack of subject matter jurisdiction." 968 F. Supp. at 1542. However, the District Court noted that, in a separate order, it was authorizing further amendment of the amended complaint to include a *Bivens* claim against Agent Brannan, thereby substituting an

11

actual defendant for the A to Z "fictitious" defendants.

The District Court then addressed the balance of plaintiffs' claims:

. . .[T]his court does not have jurisdiction over several of the Plaintiffs' claims. The breach of contract claim relating to the reward must be filed in the United States Court of Federal Claims, rather than in this court. The claims based on use of the media, interference with business, negligent and/or wanton supervision, inappropriate statements, fraud and the telephone call are claims from which the United States is immune on the basis of sovereign immunity, because of specific exceptions in the Federal Tort Claims Act.[4]

The claims against the United States which survive the Motion for Summary Judgment and on which the Plaintiffs will be allowed to proceed are those for outrageous conduct, and negligence based on trespass on the Plaintiffs' business premises and home, invasion of privacy based on trespass on the Plaintiffs' home, and those for invasion of privacy, conversion, outrageous conduct, and negligence relating to the seizure of religious items. These claims may proceed because the Plaintiffs have established that a genuine issue of fact exists as to whether the search warrants were obtained by intentionally or recklessly presenting false affidavits to the issuing magistrate judge as evidence of probable cause. Our constitution does not permit such conduct by our government and a violation of this constitutional guarantee may give rise to state law claims against the United States.

968 F. Supp. at 1542-43.

---

[4]Of this group of dispositions, plaintiffs have only appealed the dismissal of (1) the "claims based on use of the media" (misinformation allegedly leaked to the media by FBI agents and other officials placing Mr. O'Ferrell in the false light of culpability), and (2) the "claims based on ... inappropriate statements" (alleged threats to the O'Ferrells by FBI agents). On the authority of *Metz v. United States*, 788 F.2d 1528 (11th Cir. 1986), *cert. denied*, 479 U.S. 930 (1986), the media claims were held barred by the FTCA's exception from liability of claims "arising out of ...libel [or] slander" 28 U.S.C. §2680(h). The alleged "inappropriate statements" were held not actionable as falling within the FTCA's "discretionary function," 28 U.S.C. §2680(a) exception. Appellants' challenges to these rulings are addressed *infra* at parts IV(A)(1) and (2) of this opinion.

B.  The Bench Trial Rulings.

The District Court subsequently conducted a bench trial of plaintiffs' remaining FTCA claims.  On November 24, 1998, the District Court entered judgment in favor of the United States on all counts.  *See O'Ferrell v. United States*, 32 F. Supp.2d 1293 (M.D. Ala. 1998).

At the bench trial, plaintiffs contended that the challenged search warrants issued at the request of the FBI in January of 1990 did not fall within the FTCA's discretionary exception because the supporting affidavit was constitutionally flawed.  Specifically plaintiffs contended that Special Agent Stephen Brannan's affidavit, on the basis of which Magistrate Judge Carroll issued the search warrants, contained intentionally or recklessly false information.  The District Court rejected plaintiff's contention.  The District Court was not persuaded that Agent Brannan's submission, based on Agent Bodziak's finding of a typewriter match, was false.  Plaintiffs, the District Court found, had "not carried their burden of proving that the typewriter which the Plaintiffs used to create their Notice of Appeal in *O'Ferrell v. Gulf Life Ins. Co.* was different from the typewriter which the bomber used to create the bomb labels and threatening letters."  32 F. Supp.2d at 1301.  Indeed, the District Court went further, finding that "there was, in fact, a match, that the O'Ferrell documents and the bomber documents were typed on the

13

same typewriter. Accordingly, the court finds that the Plaintiffs have not established that the statements in the Brannan affidavit were false." *Id.* at 1302. Alternatively, the District Court found no evidence that Agent Bodziak had acted recklessly in failing to consult sources other than the FBI typewriter standards file and the representative from Brother Industries. *See id.* at 1303. For both of these reasons, the Bodziak finding set forth in the Brannan affidavit was found by the District Court not to have been recklessly false.

With respect to the asserted detention and conversion of plaintiffs' property, the District Court noted that 28 U.S.C. § 2680(c) precludes FTCA liability with respect to "[a]ny claim arising in respect of . . . the detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement officer." 28 U.S.C. § 2680(c) (West 2000). The District Court relied on this court's opinion in *Schlaebitz v. United States*, 924 F.2d 193, 195 (11th Cir. 1991), holding that suits "based on the detention of goods by law enforcement officers in the performance of their lawful duties" are barred by the FTCA.

On appeal, plaintiffs contend that the District Court erroneously granted summary judgment in favor of the United States based on the plaintiffs' tort claims relating to (1) the government's alleged leakage to the media of misrepresentations implicating Mr. O'Ferrell in the mail bombings, and (2) threats allegedly made by

14

government agents to the O'Ferrells. Plaintiffs also appeal the District Court's bench trial determinations that (1) probable cause existed for the issuance of the search warrants, and (2) 28 U.S.C. § 2680(c) barred the plaintiffs' claims of conversion and detention of property seized by the government in the execution of search warrants.

## III. Standard of Review

This court reviews a grant of summary judgment *de novo,* applying the same standard as the district court. *See McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir. 2000). To prevail on a summary judgment motion, the moving party carries the initial burden of demonstrating to the court that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied that burden, the burden shifts to the nonmoving party to present evidence that there is indeed a genuine issue for trial. *See id.* at 324. All inferences must be drawn in favor of the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

A district court's bench trial findings of fact are reviewed to determine whether they are clearly erroneous. *See United States v. Cancela*, 812 F.2d 1340 (11th Cir. 1987). Conclusions of law are reviewed *de novo*. *See Florida Ass'n of Rehab. Facilities, Inc. v. State of Florida Dept. of Health and Rehabilitative*

*Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000).

## IV. Discussion

We turn now to the issues presented by Mr. O'Ferrell and Ms. Martin on this appeal. Appellants make four contentions, two addressed to the District Court's rulings on summary judgment and two addressed to the District Court's rulings at the conclusion of the bench trial. We will begin with the two contested summary judgment rulings.

A. Summary Judgment.

1. The Alleged Release of Misinformation to the Media.

On appeal, as in the District Court, Mr. O'Ferrell and Ms. Martin complain of the release to the public, and in particular to the media, of greatly disparaging defamatory statements; appellants contend that hearing and reading those statements caused them great anguish. As noted above (footnote 5, *supra*), the District Court concluded that the claim was barred by the provision of the FTCA which recites that the Act "shall not apply to . . . [a]ny claim arising out of . . . libel, slander . . ." 28 U.S.C. § 2680(h). In support of its ruling the District Court cited this court's decision in *Metz v. United States*, 788 F.2d 1528 (11ᵗʰ Cir. 1986), *cert. denied*, 479 U.S. 930 (1986). In *Metz,* plaintiff's claim was that federal law enforcement agents had committed the state law torts of intentional infliction of

16

emotional distress and intrusion upon privacy. This court held in *Metz* that the plaintiff's claims were barred because (1) they were derivative from plaintiff's underlying contention that he had been the victim of false arrest, and (2) "false arrest" is one of the tort claims barred by 28 U.S.C. § 2680(h). In the case at bar, Mr. O'Ferrell and Ms. Martin have acknowledged, in their brief on appeal, "that the public statements were false and defamatory, and that the statements were certainly published to third parties," but they contend that "the principles enunciated in *Metz* do not apply because they claim damage flowing directly to them in the form of mental anguish as a result of their personally hearing and reading the false statements. In other words, although their false light invasion of privacy arguably falls in the realm of a claim of damage for injury to reputation, their negligence, negligent supervision, and tort of outrage claims do not." Appellants' Brief at 24. We think, however, that *Metz* is fully applicable to appellants' claims. In *Metz* we said that the exceptions in the FTCA are not limited to the torts specifically named therein, but rather encompass situations where "the underlying governmental conduct which constitutes an excepted cause of action is essential to plaintiff's claim." *Metz*, 788 F.2d at 1534. The principles there announced govern the case at bar.

    2. Alleged Threatening Statements of Government Agents.

Mr. O'Ferrell and Ms. Martin contend that the District Court erred in granting summary judgment with respect to their claim that FBI agents made illegal threats in the course of interrogation. Appellants state that they were threatened with "the electric chair" if they did not confess. First Amended Complaint at ¶ 20. Further, FBI agents are said to have told Mr. O'Ferrell that at one point he was "in the sights of their high powered rifles." Appellants' Brief at 24. As noted above (footnote 5, *supra*), the District Court concluded that this claim was barred by 28 U.S.C. § 2680(a) which precludes "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the government, whether or not the discretion involved be abused." Determining whether challenged government conduct is protected by the discretionary exception of § 2680(a) requires a court to address two questions. First, a court must look to the nature of the challenged conduct and decide whether the conduct "violated a mandatory regulation or policy that allowed no judgment or choice." *Autery v. United States*, 922 F.2d 1523, 1526 (11th Cir. 1993). The discretionary function exception will not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Second, if the court determines that no "statute,

regulation or policy specifically prescribes a course of action," the court must then consider whether the challenged conduct "is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23.  The purpose of the exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323.

With respect to the first question, Mr. O'Ferrell and Ms. Martin argue that the interrogation techniques used by the agents did "violate[ ] a mandatory regulation or policy that allowed no judgment or choice." *Autery*, 922 F.2d at 1526.  Appellants note that the FBI manual prohibits "physical abuse or the threat of such abuse." FBI Manual at ¶ 7-2.1.  But appellants have not alleged "physical abuse or the threat of such abuse."  They contend that they were told they faced "the electric chair."  However minatory such a statement would be, it would constitute not a threat of present physical abuse but a prophecy of what might befall appellants in the future if they failed to confess and were ultimately convicted.  Nor was the alleged statement that agents had had Mr. O'Ferrell in the sights of their high-powered rifles a threat of present physical abuse; it was a recital of something that had assertedly happened in the past.

We turn, then, to the second question.  Bearing in mind that the alleged

19

statements did not produce a confession, we think the District Court's rejection of appellants' claim was correct. Just how law enforcement agents are to conduct interrogations would appear to be a paradigmatic example of a discretionary function. The process is one that involves elements of judgment and choice—the central ingredients of discretion. If, in the case at bar, FBI agents did in fact predict death in the electric chair if Mr. O'Ferrell failed to confess, such conduct would certainly constitute an indefensibly gross abuse of their discretion; but the FTCA expressly exempts the United States from liability for acts which constitute abuse of discretion.

B. The Bench Trial.

We turn now to appellants' two challenges to the rulings made by the District Court at the close of the bench trial.

1. The Validity of the Search Warrants.

In challenging the validity of the search warrants issued by Magistrate Judge Carroll at Agent Brannan's behest, appellants have undertaken to show that the search warrants fail the test laid down by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks,* if an affidavit submitted to a judicial officer in support of a request for a search warrant contains "a false statement [made] knowingly and intentionally, or with reckless disregard for the

truth," and if, stripped of that false statement, the affidavit does not establish probable cause, "the search warrant must be voided. . . ." *Id.* at 155-56. In short, to prevail in a *Franks* challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in "reckless disregard for the truth," and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant. Appellants contend here, as they did in the District Court, that the representation made by Agent Brannan to Magistrate Judge Carroll of a match between the "*O'Ferrell* documents" and the "bomber documents" – i.e., that the appeal notices and envelopes in *O'Ferrell v. Gulf Life Ins. Co.* were, in the words of the Brannan affidavit, "prepared on the same typewriter that was used to prepare" the bomb-package labels and the death-threat letters – was not true, and that the representation was not only untrue but recklessly so. Establishing these two propositions would suffice to undermine the search warrants, for it is manifest that, absent a link between the two sets of typed documents, the FBI would not have had probable cause to search appellants' premises.

We will first consider the alleged falsity of the representation that the same typewriter typed the "*O'Ferrell* documents" and the "bomber documents." Next,

21

assuming *arguendo* the falsity of the representation, we will consider whether the inclusion of that representation in the affidavit was "in reckless disregard for the truth."

### a. The Alleged Falsity of the Affidavit.

Agent Brannan's statement in his affidavit that the FBI laboratory had determined that the two sets of documents "were prepared on the same typewriter" was unquestionably correct: The FBI laboratory, in the person of Agent Bodziak, had made exactly that determination; Agent Brannan had been so informed; and his affidavit recited the information given to him. Appellants' challenge is, then, directed to Agent Bodziak's representation of a typewriter match. That representation, appellants contend, was erroneous and was demonstrably so. The representation, appellants point out, concededly rested on Agent Bodziak's conclusion that the unusual number one was a replacement character unique to a particular Brothers Industries manual typewriter, whereas – as Agent Bodziak subsequently learned and has since acknowledged – Brothers Industries in 1961 and 1962 in fact manufactured perhaps as many as ten thousand typewriters containing the unusual number one.

The District Court, in its careful bench opinion, addressed the alleged falsity of Agent Bodziak's representation of a typewriter match as follows:

The Plaintiffs base their assertion of a false statement on Special Agent Bodziak's belief in January 1990 that the unusual numeral one in the two sets of documents was a replacement character. Because Mr. Bodziak subsequently discovered that the unusual numeral one had been original equipment on a limited number of typewriters, the Plaintiffs claim that he was mistaken in determining that there was a match between the two sets of documents. At numerous points in his testimony, however, Mr. Bodziak maintained that he still believes the bomber documents and the O'Ferrell documents came from the same typewriter. Thus, the court has heard evidence from a certified documents examiner that the documents in question matched, based on reasons detailed in his testimony.

As reasons for maintaining the validity of the match, Mr. Bodziak mentioned the limited number of typewriters manufactured with the unusual numeral one; the significant time lapse between 1962 when the manufacturer ceased making these typewriters and the late 1980's when the O'Ferrell documents and the bomber documents were typed; the poor quality of that vintage typewriter and the lessened likelihood that those typewriters could survive for such a time period; the fact that FBI agents screened tens of thousands of documents from various parts of the country and never located other Brother style typewritten documents which contained the unusual numeral one; and other similarities between the documents pertaining to the letters A, J, P, R, and S, and the numerals three and four.

To prove that the statement in the Brannan affidavit was false, the Plaintiffs must do more than show that the original basis for Special Agent Bodziak's determination of a match was incorrect. They must prove that the conclusion itself was incorrect. The statement that the FBI lab determined a match was true. Therefore, it is not sufficient to prove that that determination was recklessly made; it first must be proved that the determination itself was false, that there was not a match between the O'Ferrell documents and the bomber documents. Only then would the issue of whether the determination was recklessly made become relevant.

The Plaintiffs have asserted that there were some variations between certain characteristics in the documents. Mr. Bodziak explained, however, that such variations are expected with old manual typewriters,

23

especially when there has been a time lapse such as the 16-month period between the creation of the O'Ferrell documents and the bomber documents.

The Plaintiffs produced no credible affirmative evidence refuting Mr. Bodziak's conclusions. [ ] Plaintiffs were given complete access to the questioned documents for the purpose of having them examined by experts. They have produced no one who disagreed with the opinion of the FBI's certified document examiner that there was a match. The court finds from the evidence that there was, in fact, a match, that the O'Ferrell documents and the bomber documents were typed on the same typewriter. Accordingly, this court finds that the Plaintiffs have not established that the statements in the Brannan affidavit were false.

*O'Ferrell*, 32 F. Supp. 2d at 1301-02.

In undertaking to show that the District Court erred in finding that the "*O'Ferrell* documents" and the "bomber documents" were typed on the same typewriter, appellants contend that the testimony of Agent Bodziak[5], on which the District Court placed heavy reliance, was not worthy of belief. Noting that Agent Bodziak acknowledged that his January 19, 1990 finding of a match between the two sets of documents was flawed, since it depended on a subsidiary finding, concededly erroneous, that the unusual number one was a uniquely identifying characteristic of a particular Brothers Industries typewriter, appellants contend that the portions of the Bodziak testimony in which the witness tried to show that, notwithstanding his January 19, 1990 mistake, there was a match, are internally

---

[5]The testimony in question is deposition testimony. Agent Bodziak was not presented as a live witness before the District Court.

24

inconsistent and lacking in any claim to credibility.

Having reviewed Agent Bodziak's uncontradicted testimony,[6] we disagree. We think the testimony provides reasoned support for the District Court's finding that the two sets of typed documents matched. We believe it appropriate to set out, in a footnote, an extended excerpt from the Bodziak testimony which, in our judgment, adequately conveys the gist of the entire testimony and to which, in our judgment, the District Court was entitled to give credence.[7] In sum, we think the

---

[6]The District Court noted that one affidavit of record did appear to contradict Agent Bodziak's testimony, but the District Court went on to characterize the affidavit, assuming its admissibility, as itself undermined by the affiant's subsequent deposition:

> There was some testimony concerning an affidavit of a typewriter repairman, John Phillips, expressing an opinion that the documents derived from different typewriters. In light of Mr. Phillips' deposition, however, where he completely contradicts his earlier statements and testifies that the documents could have been typed on the same typewriter, the court finds Mr. Phillips' earlier statements, even if they were admissible, to be unworthy of credence.

*O'Ferrell*, 32 F. Supp. 2d at 1302, n. 2. The District Court's assessment of the Phillips affidavit seems to us sound.

[7] This excerpt is taken from Agent Bodziak's deposition testimony, pages 196 - 199:

Q.   Based on the fact that you learned in late 1990 that the numeral one was manufactured and designed with that Brother typewriter, in other words, it was original character on that typewriter, what is the main character that you base your opinion upon that there is an identical match between the documents in question?

A.   It's still the numeral one.

Q.   It's still the numeral one?

A.   Because of the relative few that were sold and made that were of the 1961 – early '62 vintage that no longer had been used again; because of the poor quality of the typewriter

District Court's finding of a match – and hence of the accuracy of the Brannan

affidavit – was supported by substantial evidence.  A fortiori, the District Court's

---

of that vintage and its lack or likely lack of survival to still be in existence in many places that still have that numeral in it from whatever number there were; and the fact that we had during that time – during the initiation of the case all the way to the point in time to which you're referring to in November of 1990 when we actually found out that this was intentionally manufactured on the typewriter for a short period of time that we had during that time in numerous places screened tens of thousands of documents and had never come across any other Brother style typewriters with that one and had only come across a handful of other Brother style typewriters that had the replacement one, the one that started in 1961 and that were manufactured in much larger production for a long number of years, nevertheless we only found a few of those.

So that was still an extremely rare and unique characteristic, even though it wouldn't have been as unique as if it had been replaced as I had originally thought on January – excuse me – December – excuse me – January 19, 1990.

Q.    You indicated reviewing thousands of documents.  You're referring to court filings?

A.    Court filings, Justice Department records, bureau records, field office records.

Q.    Pertaining – okay.  Other than – When you talk about the court filings, you're referring to agents in the field reviewing court cases that have been filed by people in courts in the southeast?

A.    Court cases.  Well, court cases, anonymous letters that are mailed in cases throughout the country; letters which are mailed to the department of Justice in various categories were being looked at.

A.    Such as threatening type letters, that sort of thing?

Q.    Threatening, civil rights type letters.  I wasn't in charge of that.  I don't know.  But I know there were task forces of people looking at this, and it also included searching libraries, schools, government facilities.  It even extended to finding typewriters along the side of the road in dumpsters, typewriters that people said in response to that newspaper article that they thought they might have had one and they sold it to someone or they still had one, come look at it.

Just virtually every typewriter over all those months that we could get a sample of or get a look at, whether it was operable or not.

26

further finding that appellants had not shown by a preponderance of the evidence that there was not a match was not clearly erroneous.

### b. The Alleged Recklessness of Agent Bodziak's Representation.

Assuming *arguendo* the falsity of Agent Bodziak's representation of a match, we will consider whether the representation was made "in reckless disregard for the truth." The District Court found that plaintiffs did not fulfill this second prong of their burden – showing that a false statement was made "knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155-56. To make such a showing required appellants to show that Agent Bodziak's finding that the numeral one was a replacement character was recklessly made.

Agent Bodziak made his finding based on three sources: (1) The horizontal spacing of the type, (2) the FBI standards file, and (3) a conversation with Brother Industries representatives. There was one book in the FBI's library that might have alerted Agent Bodziak to the correct typewriter model, the *Haas Atlas*. Agent Bodziak did not consult this source. The District Court found that his failure to consult the *Haas Atlas* was not reckless, and we agree. The District Court found that Agent Bodziak believed the FBI typewriter standards file to be "the most

27

comprehensive collection of typewriter standards available to a document examiner." 32 F. Supp. 2d at 1303. That Agent Bodziak may have been in error in this assessment might arguably betoken negligence, but we agree with the District Court that it does not betoken recklessness. In short, appellants have not shown that Agent Bodziak's representation that the same typewriter was used to type the O'Ferrell appeal documents and the bomber documents was recklessly made.

2. Conversion and Detention of Property.

Mr. O'Ferrell and Ms. Martin claim that some of their personal property was not returned to them even after it was determined that the property was of no evidentiary value in the mail bombing investigation. But their attempt to attribute liability to the government for this detention is foreclosed by our decision in *Schlaebitz*. We there held that the government had immunity from claims of conversion and detention of personal property under 28 U.S.C. § 2680(c). Section 2680(c) exempts from FTCA liability "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by an officer of customs or excise or any other law-enforcement officer." We held, in *Schlaebitz*, that "any other law-enforcement officer" is not limited to officials assisting the customs or tax collection, but includes "officers in other agencies performing their proper duties." *Schlaebitz,*

28

924 F.2d at 194. This interpretation of the statute immunizes the United States from liability for detaining the O'Ferrells' personal property.

## V. Conclusion

From January of 1990 to October of 1990, appellants were targets of an intensive federal investigation which sought to determine their culpability with respect to an horrendous group of crimes. In the event, appellants were cleared. But there can be little doubt that, during the months in which they were prime suspects and every phase of their life together was subjected to unremitting scrutiny and routine disruption, the stresses appellants weathered were massive. However, as the District Court determined in two thoughtfully crafted opinions and as we agree with respect to the issues presented to us on this appeal, those stresses did not constitute legally cognizable harm. Accordingly, the orders of the District Court granting summary judgment in favor of the United States on the bulk of appellants' claims and, after a bench trial, dismissing appellants' remaining claims are AFFIRMED.[8]

---

[8]Even as we sustain the rulings rejecting appellants' claims against the United States, we are constrained to note that in one respect the current official attitude of the United States towards the appellants – persons who apparently were innocently enmeshed in tragic events that took place many years ago – is rather more dismissive than seems appropriate. We have in mind the fact that, a decade after the events that gave rise to this lawsuit, the United States had still not seen fit to return to appellants certain items of property taken from them in the course of the searches of appellants' premises. When, in the course of oral argument, we inquired why this was so, we were informed by counsel for the United States that "there may be reasons for law

enforcement to retain items, for some period of time, after a seizure." What those reasons might be – a decade later – it is somewhat difficult to conjecture.